Thomas C. **WALLACE**, Plaintiff,

v.

**SUFFOLK COUNTY POLICE DE-PARTMENT, County of Suffolk, John Gallagher, Phillip Robilotto and James Abbott, Individually and in their official capacities, Defendants.**

No. 04–CV–2599.

United States District Court, E.D. New York.

Feb. 15, 2005.

Gregory Scolieri, Esq., Leeds Morelli & Brown, P.C., Carle Place, for Plaintiff.

Diane Leonardo Beckman, Esq., Suffolk County Attorney's Office, Hauppauge, for Defendants.

*MEMORANDUM & ORDER*

SEYBERT, District Judge:

*INTRODUCTION*

Plaintiff Thomas C. Wallace commenced this action pursuant to 42 U.S.C. § 1983 against Defendants County of Suffolk, Suffolk County Police Department ("SCPD") John Gallagher, Phillip Robilotto and James Abbott, alleging retaliation in violation of his First and Fourteenth Amendment rights. Plaintiff contends that Defendants forcibly retired him from the SCPD and committed other harassing acts against him in retaliation for his speech concerning alleged shortcomings of the SCPD. Pending before the Court is Defendants' motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' motion is GRANTED, in part, and DENIED, in part.

*BACKGROUND*

The following facts, gleaned from the Complaint and accompanying papers, are deemed true and construed in a light most favorable to the Plaintiff for the purpose of this motion. *See King v. American Airlines*, 284 F.3d 352, 356 (2d Cir.2002).

Plaintiff was hired by the Suffolk County Police Department ("SCPD") in July 1986 and, in June 1997 was assigned to the Emergency Services Unit ("ESU"). On March 11, 1998, he was injured in the line of a duty in a massive boat explosion. Plaintiff sustained serious injuries as a result of the incident. He has undergone numerous surgeries to remedy his maladies, but still suffers from severe degenerative joint disease in his lower left leg, a herniated disk, a bulging disk in his lower vertebrae, and arthritis in his left hip. Plaintiff never returned to work after the accident.

After the accident, Plaintiff had numerous meetings and conversations with various SCPD representatives. During these meetings, Plaintiff voiced his concern about improprieties allegedly plaguing the SCPD. While it is unclear what occasioned any of these meetings, according to Plaintiff, the first interaction occurred in the summer of 1999, when Plaintiff spoke with the Deputy Commissioner of the SCPD, James Abbott ("Abbott").

During the conversation, Plaintiff expressed his beliefs that: (1) the SCPD did not have adequate training protocols or equipment to ensure the safety of its officers and the public; (2) the existing SCPD rules and protocols were not being followed; (3) the ESU was not adequately staffed; and (4) there was dissension in the ranks of the ESU. Plaintiff told Abbott that the aforementioned conditions placed both the officers and the public at risk. Additionally, Plaintiff informed Abbott of fraudulent documentation and a potential cover-up with respect to the March 11, 1998 boat explosion.

According to Plaintiff, Abbott responded to Plaintiff's complaints by offering to place him on the Commissioner's List, allowing Plaintiff to receive full pay, including raises, until Plaintiff reached the age of 62.

"In or around late 1999," however, Abbott reneged and denied ever making this proposal. (Compl.¶ 16). Instead, Abbott allegedly informed Plaintiff that he was going to be retired by the Risk Management Department.

Plaintiff's next meeting with SCPD representatives occurred on April 10, 2000, when Chief Joseph Monteith ("Monteith"), and other SCPD personnel went to Plaintiff's home. Plaintiff once again raised concerns about officer training and safety, as well as the lack of adherence to SCPD's rules, procedures, and protocols within

SCPD. Plaintiff told Monteith that he would "go public with these issues if an investigation did not commence." (Compl.¶ 17).

In September 2000, Plaintiff had another conversation with Abbott. Plaintiff made the same allegations of corruption and mismanagement raised in prior meetings, together with a new allegation. Specifically, Plaintiff suggested that Phillip Robilotto ("Robilotto"), the on-scene commander on the day of the accident and the head of the SCPD's Internal Affairs Department, might have been suppressing an investigation of the accident. Plaintiff requested that Abbott commence an investigation into these claims.

Abbott declined Plaintiff's request, allegedly informing Plaintiff that "we are not doing anything that will make the police look bad." When Plaintiff indicated that, absent an investigation, he would go to Newsday with his allegations, Abbott told Plaintiff, "that can't happen" and expressed to Plaintiff that the SCPD would not "take kindly to any type of effrontery." (Compl.¶ 18). Additionally, Abbott allegedly told Plaintiff, "words to the effect of, 'do something now, and lament it for a lifetime.'" (Compl.¶ 18).

In October 2001, Plaintiff, with his then lawyer Thomas Speer, met with Robilotto. During the meeting, Plaintiff raised all of the aforementioned allegations of malfeasance, including the alleged cover-up of the March 11, 1998 accident. According to Plaintiff, Robilotto responded, "you don't understand how powerful the police department is." (Compl.¶ 19).

In or around November 2002, the SCPD, without Plaintiff's consent, filed for Plaintiff to receive his retirement. Plaintiff believes that John Gallagher ("Gallagher"), Commissioner of the SCPD, and Robilotto prepared the paperwork. According to Plaintiff, his retirement documentation omitted certain injuries that he suffered in the March 11, 1998 accident. Plaintiff contends that this paperwork was submitted prematurely, and omitted his injuries in retaliation for Plaintiff's comments about the SCPD. On April 6, 2004, New York Retirement and Local Systems rejected the retirement application.

In April 2003, Plaintiff told an SCPD Internal Affairs lieutenant that he wished to file a complaint regarding the aforementioned shortcomings of the SCPD. In May 2003, Plaintiff filed a complaint with the Suffolk County District Attorney's Office, presumably concerning the same grounds. In September 2003, Plaintiff sent Commissioner Gallagher a letter listing the same allegations of SCPD malfeasance or nonfeasance expressed in Plaintiff's prior interactions with SCPD personnel.

On October 20, 2003, the SCPD informed Plaintiff that he had been cleared to return to work. The determination was, apparently, based on a medical examination of Plaintiff conducted by the SCPD. Plaintiff, however, contends that the medical examination was a sham, and that the determination to reinstate him was retaliatory. Plaintiff alleges that he was reinstated before he was physically capable of returning to active duty because he continued to speak out against the SCPD.

Despite being reinstated, Plaintiff remained out of work, using his sick time to cover his absences. In a letter dated February 12, 2004, Plaintiff was directed, by the SCPD, to appear for a medical evaluation on February 24, 2004. Plaintiff failed to attend the evaluation; he alerted the SCPD that medical reasons precluded his attendance.

By letter dated March 4, 2004, the SCPD informed Plaintiff that the Internal Affairs Department was commencing an investigation into Plaintiff's failure to at-

tend the medical examination; the letter also informed Plaintiff that Internal Affairs was conducting an investigation into the charges Plaintiff raised in April 2003 concerning officer safety and training, falsification of documents, lack of supervision, and lack of adherence to SCPD procedures.

On June 7, 2004, Plaintiff was retired from the SCPD. Approximately three weeks later, Plaintiff commenced this action, alleging violations of 42 U.S.C. § 1983. Plaintiff contends that the Defendants violated his First and Fourteenth Amendment Rights by retaliating against him for speaking out on matters of public concern. The Defendants have moved to dismiss the Complaint.

## DISCUSSION

### I. Standard On A Motion To Dismiss

A district court should grant a motion to dismiss only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with allegations.' " *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff and accept these factual allegations as true. *H.J. Inc.*, 492 U.S. at 249, 109 S.Ct. 2893; *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 165, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (noting the Federal Rules' liberal system of notice pleading).

In deciding a motion to dismiss, the district court's duty "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000); *see also Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). The appropriate inquiry, therefore, is not whether a plaintiff's claims are ultimately meritorious, but whether the plaintiff is entitled to offer evidence to support them. *See Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123–24 (2d Cir.1991) (plaintiff is not compelled to prove his or her case at the pleading stage).

Additionally, a plaintiff is not required to set out in detail the facts upon which he or she bases a claim. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A plaintiff need only give a statement of his or her claim that will give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Id.* Therefore, where a complaint is filed that charges each element necessary to recover, the dismissal of the case for failure to set out evidential facts can seldom be warranted. *See U.S. v. Employing Plasterers Ass'n*, 347 U.S. 186, 189, 74 S.Ct. 452, 98 L.Ed. 618 (1954). Moreover, pleadings are more liberally construed where, as here, 'the plaintiff alleges civil rights violations....' *Tsai v. Rockefeller Univ.*, 137 F.Supp.2d 276, 280 (S.D.N.Y. 2001) (quoting *Cruz v. Gomez*, 202 F.3d 593, 596 (2d Cir.2000)) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)).

However, allegations that are so baldly conclusory that they fail to give notice of the basic events and circumstances of which a plaintiff complains are meaningless as a practical matter and, as a matter of law, are insufficient to state a claim. *See Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987).

### II. Plaintiff's Section 1983 Claims

In order to state a claim for relief pursuant to 42 U.S.C. § 1983, "a plaintiff must

allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylaq,* 188 F.3d 51, 53 (2d Cir.1999); *see also Dwares v. New York,* 985 F.2d 94, 98 (2d Cir.1993) (overruled on other grounds).

Here, there is no issue as to whether the challenged conduct was perpetrated by officials acting under the color of state law. The only issue is whether Plaintiff has alleged a violation of his constitutional rights. Plaintiff claims that Defendants violated his First Amendment rights by harassing him, and taking other retaliatory measures against him in an effort to silence his complaints concerning the SCPD. Plaintiff further alleges that the same retaliatory actions violated his right to equal protection of the laws provided by the Fourteenth Amendment.

### A. *First Amendment Retaliation Claims*

■ To state a First Amendment retaliation claim, a plaintiff must establish that "(1) his speech was constitutionally protected, (2) he suffered an adverse employment action, and (3) that a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination." *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 553 (2d Cir.2001); *see also Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). The Court considers each of the three elements in turn.

### 1. *Constitutionally Protected Speech*

■ It is well established that a "governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *City of San Diego v. Roe,* 543 U.S. 77, 125 S.Ct. 521, 523, 160 L.Ed.2d 410 (2004). But a public employee does not forfeit First Amendment rights in exchange for a paycheck. *See Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Most notably, courts have protected a public employee's right to comment on matters of public concern. *See Roe,* 125 S.Ct. at 525; *DePace v. Flaherty,* 183 F.Supp.2d 633, 636–37 (S.D.N.Y.). The rationale for affording this protection is that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." *Roe,* 125 S.Ct. at 525.

Whether a public employee's speech relates to a matter of public concern depends on the "content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 146–47, 103 S.Ct. 1684. Within this construct, the Court must determine whether Plaintiff's speech concerns a "subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *Roe,* 125 S.Ct. at 526. If the speech pertains to such matters, it relates to a matter of public concern. *See Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir.1999).

■ Defendants contend that the personal nature of Plaintiff's complaints precludes a finding that Plaintiff's speech pertained to matters of public concern. *See Ezekwo v. New York City Health & Hosp. Corp.,* 940 F.2d 775, 781 (2d Cir.1991) (rejecting First Amendment retaliation claim because plaintiff's speech concerned a matter that was personal in nature). Defendants' argument, however, oversimplifies Plaintiff's allegations.

While portions of Plaintiff's speech relate to experiences unique to Plaintiff, much of the speech concerned matters of great importance to the general public. For example, the Complaint alleges that Plaintiff repeatedly spoke to Defendants about the condition of the SCPD's ESU unit, stating that "the department did not have proper training protocols ... [or] equipment to ensure the safety of its officers and the public," and that the ESU's failure to adhere to the existing training protocols, rules and procedures "placed officers and the public in danger." (Pl.'s Compl. ¶ 14).

The Court finds such speech to be of significant concern to the general public, as it is analogous to "speech on crime rates, police staffing, equipment shortages and related budgetary matters" that "quite plainly involve matters of public concern." *Morris*, 196 F.3d at 111; *see White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1060 (2d Cir.1993) (stating that "a state police corps' performance of its duties is a matter of public concern"). Indeed, there is little doubt that the public has great interest in acquiring information about the proper functioning of its police force—particularly where the information purports to directly relate to their own safety. *See Cahill v. O'Donnell*, 7 F.Supp.2d 341, 349 (S.D.N.Y.1998) (holding that investigations into purported police misconduct where civilians were, or could have been harmed is a matter of public concern).

That certain of Plaintiff's statements concern events personal to Plaintiff does not preclude a finding that his speech was constitutionally protected. In order to invalidate Plaintiff's First Amendment retaliation claim on the grounds that Plaintiff's speech was not protected, the Court would have to conclude that Plaintiff's speech, as a whole, was unprotected, motivated only by Plaintiff's personal interest. *See Ezek-* *wo*, 940 F.2d at 781. The Court declines to reach this conclusion. Based on the Complaint, the Court finds it difficult to ascertain what, if anything, Plaintiff had to gain by pointing out the SCPD's alleged shortcomings. To the contrary, it appears Plaintiff's speech was primarily motivated by concern for the safety of the public and his fellow officers. Such speech is not precluded from First Amendment protection simply because it may have been spurred by Plaintiff's own unsettling experiences. *See Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir.2003) ("There is no question that [plaintiff] took a personal interest in the matters about which he wrote. . . . The thrust of the speech, however, is aimed at the alleged system-wide epidemic that affected ... the voting public as a whole. Indeed, if the letter is viewed as requesting that action be taken, the benefit of such action would inure more to the group than to him specifically. Therefore, the 'predominant content' of [plaintiff's speech] addressed matters of public concern.").

Notwithstanding the subject matter of Plaintiff's speech, Defendants contend that much of the speech is not protected because it was not delivered in a public forum. According to Defendants, the first incident of protected speech occurred in May 2003, when Plaintiff filed a complaint with the Suffolk County District Attorney. It is well-established, however, that "[t]he mere fact that a public employee chooses to discuss privately his concerns with his employer as opposed to expressing his view publicly does not alter the analysis [of whether a statement relates to a matter of public concern]." *Ezekwo*, 940 F.2d at 781; *see Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) ("Neither the [First] Amendment itself nor our decisions indicate that [freedom of speech] is lost to the public employee who arranges to com-

municate privately with his employer rather than to spread his views before the public"). Accordingly, Defendants' attempt to label Plaintiff's pre-May 2003 speech as unprotected is unavailing.

### 2. Adverse Employment Action

The Court next considers whether Plaintiff has sufficiently alleged an adverse employment action. In order to plead an adverse employment action, Plaintiff must allege that he experienced a "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000). The change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* Some examples of adverse employment actions are termination, "demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to particular situation." *Id.; see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).

■ While "less flagrant reprisals" than termination or reduction in benefits may constitute adverse employment actions, " 'not every unpleasant matter short of [discharge or demotion] creates a cause of action' for retaliatory discharge." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997) (quoting *Welsh v. Derwinski*, 14 F.3d 85, 86 (1st Cir.1994)). But an accumulation of "seemingly minor incidents" may combine to establish an "atmosphere of adverse employment action," sufficient to allege a retaliation claim. *Phillips*, 278 F.3d at 109. In determining whether an adverse employment action has occurred, the Court must "pore over [the] case to determine whether the challenged employment action reaches the level of adverse' " *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir.1999) (quoting *Wanamaker*, 108 F.3d at 466).

Plaintiff alleges that the following actions either constitute separate adverse employment actions or combine to establish an atmosphere of adverse employment action: (1) in November 2002, Defendants Robilotto and Gallagher prematurely submitted Plaintiff's retirement papers, and omitted Plaintiff's March 11, 1998 injuries from the paperwork; (2) in October 2003, the SCPD determined that Plaintiff was physically capable of returning to work; (3) in March 2004, the SCPD attempted to charge Plaintiff with insubordination for his failure to attend a medical examination; and (4) the SCPD failed to place Plaintiff on the Commissioner's List as promised in September 1999. The Court separately considers each of Plaintiff's allegations, and then considers their combined impact.

#### a. The Submission Of Plaintiff's Retirement Papers

■ Plaintiff alleges that, in November 2002, Defendants Robilotto and Gallagher prematurely—and without Plaintiff's consent—submitted his retirement papers in retaliation for his continuing criticisms about the SCPD. Plaintiff contends that, when his retirement paperwork was submitted, several other officers had been on leave from the SCPD longer than Plaintiff and should have had their paperwork submitted ahead of him. Plaintiff maintains that he was singled out for retirement because of his continuing complaints about the SCPD.

Additionally, and indisputably in tension with Plaintiff's objections to the timing of the submission of his retirement paperwork, Plaintiff contends that the retirement paperwork was deficient because it failed to include any reference to the injuries Plaintiff sustained in the March 11, 1998 boat explosion. Presumably, the fail-

ure to include such injuries caused the New York Retirement and Local Systems to reject Plaintiff's application. (Pl.'s Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 13). Therefore, according to Plaintiff, the SCPD was trying to retire him prematurely as a punishment for his protected speech, but, at the same time, was purposefully handicapping their own efforts by omitting information that would make the approval of Plaintiff's retirement more likely. The Court can only construe such allegations as pleading in the alternative.

Defendants contend that no adverse employment action can be divined from the filing of the retirement papers because: (1) the paperwork was submitted before Plaintiff engaged in any protected speech or activity; (2) SCPD officials are authorized, by statute to submit retirement paperwork on behalf of employees, with or without their consent; and (3) it is unclear how the omission of certain injuries from his retirement paperwork could be considered adverse.

The Court finds the alleged premature submission of Plaintiff's retirement paperwork insufficient to establish any adverse employment action. Most pertinent to the Court's analysis is the simple fact that the November 2002 retirement application was rejected by the New York Retirement and Local Systems in April, 2004. Because the paperwork was rejected, Plaintiff never experienced any material change in his employment circumstances due to the submission.

However, Plaintiff's claim that his injuries were purposefully omitted from his retirement application in an effort to penalize him for his protected speech is sufficient, at this stage, to establish an adverse employment action. The failure to include this information arguably precluded Plaintiff from obtaining his retirement benefits in a timely manner. The alleged deprivation of benefits is sufficient, at this time, to support Plaintiff's retaliation claim.

Defendants' arguments do not disturb this conclusion. As explained above, the Complaint contains allegations of protected speech occurring long before the filing of Plaintiff's retirement papers, rendering Defendants' timing argument inapplicable. Defendants' reliance upon the retirement statute is similarly unavailing. As Plaintiff properly points out, acts that are otherwise authorized by law can take on a different character when executed with a retaliatory motive. In other words, Plaintiff is not objecting to the legitimacy of the procedure followed, but rather the alleged retaliatory motives undergirding its application to him. *See Amnesty Amer. v. Town of West Hartford,* 361 F.3d 113, 125 (2d Cir.2004) (stating that a § 1983 violation may be pled by establishing a practice or custom of unconstitutional application of a constitutionally valid law). The issue of whether or not Defendants were justified in their actions is a question of fact, improperly raised on a motion to dismiss.

#### b. *Reinstatement To Active Duty*

■ Plaintiff contends that the SCPD retaliated against him by reinstating him to active duty before he was physically capable of returning. Specifically, Plaintiff alleges that the SCPD made him undergo a "predetermined" medical exam, and then reinstated him to active duty in October 2003, almost one year after the SCPD filed his retirement paperwork. Defendant contends that Plaintiff's reinstatement cannot be construed as an adverse employment action because Plaintiff was only reinstated to light duty and the reinstatement was authorized by statute. *See* N.Y. Gen. Mun. L. § 207–c.

Notwithstanding the tension between Plaintiff's objection to his reinstatement

and the seemingly contrary grievances found throughout the Complaint,[1] Plaintiff's claim that he was forced to return to work prematurely sufficiently alleges an adverse employment action. The claim is not based on a "mere alteration in job responsibilities," *Galabya*, 202 F.3d at 636, but rather a request that Plaintiff perform work that he was physically incapable of performing. Such alleged change in the circumstances of Plaintiff's employment status sufficiently states an adverse employment action. *See Wanamaker*, 108 F.3d at 466.

That Plaintiff was only reinstated to perform "light" duty is of no moment. Indeed, the nature of Plaintiff's duties upon return, when viewed within the context of the Complaint, are immaterial. Plaintiff simply avers that, at the time of his reinstatement, he was physically incapable of returning to work; there is no indication as to whether he was capable of performing any duties, including light work, at the time of his reinstatement. At most, the nature of Plaintiff's duties upon reinstatement raises an issue of fact with respect to the propriety of Defendants' actions—a question outside the realm of the Court's consideration on a motion to dismiss.

Defendants' reliance on adherence to New York's General Business Law is, for the reasons explained above (in Section II, A, 2, a), similarly unavailing.

#### c. *The Charge Of Insubordination*

Plaintiff contends that the Internal Affairs Department investigation of his failure to attend a medical exam amounts to an adverse employment action. Specifically, Plaintiff claims that "[t]he SCPD is/was attempting to charge plaintiff with insubordination for not being able to attend a

medical evaluation.... the charge of insubordination against plaintiff was a retaliatory measure against plaintiff for speaking out on matters of public concern." (Compl.¶ 31).

 Defendants correctly point out, however, that, in general, "[a]n employee is not 'adversely affected' by disciplinary charges in the workplace unless the charges are decided against him." *Washington v. County of Rockland*, 211 F.Supp.2d 507, 514 (S.D.N.Y.2002) (citing *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir.1996)). Here, the Complaint does not allege either that the charges were decided against Plaintiff, or that Plaintiff suffered any changes in the circumstances of his employment status as a result of the charges. Therefore, Plaintiff may not rely on the investigation, by itself, as an adverse employment action.

#### d. *Failure To Place Plaintiff On The Commissioner's List*

Finally, Plaintiff contends that Abbott's failure to follow through on a promise to place him on the Commissioner's List constitutes an adverse employment action. Plaintiff characterizes this action as a deprivation of benefits.

 This alleged promise—by Plaintiff's own admission—amounted to nothing more than a bribe. (Pl.'s Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 16 ("In return [for being placed on the Commissioner's List], Abbott implied that he wanted Plaintiff to forget about any of the other issues that might embarrass the [SCPD].... It can be inferred that these statements were a promise that keeping quiet will result in rewards.")). The Court only entertains this purported adverse em-

---

1. Plaintiff objects to Defendants' filing of his retirement papers because the filing was premature, but also objects that the application was improperly rejected. Plaintiff's objection to his reinstatement is seemingly inconsistent with his objection to premature retirement.

ployment action long enough to note that it is highly unlikely that the Framers of the Constitution intended for the First Amendment to protect a Plaintiff's entitlement to the equivalent of "hush money." Accordingly, Plaintiff may not rely on the Defendants' failure to place him on the Commissioner's List as an adverse employment action.

### e. *Atmosphere Of Adverse Employment Action*

To the extent Plaintiff alleges that the Defendants purposefully excluded his health condition from his retirement papers and ordered his return to work before he was physically able, the Court finds Plaintiff has sufficiently alleged an atmosphere of adverse employment action sufficient to withstand a motion to dismiss. Additionally, Plaintiff's allegations that: (1) he was consistently informed that he should remain silent; (2) his retirement paperwork was prematurely submitted; and (3) an investigation was improperly launched against him—while not rising to the level of independent adverse employment actions—may also be considered in determining whether there was an "atmosphere of adverse employment action." *See Phillips,* 278 F.3d at 108.

### 3. *Causation*

Finally, the Court considers whether Plaintiff has alleged a causal connection between his protected speech and Defendants' alleged adverse employment action. A plaintiff states a sufficient causal connection by alleging close temporal proximity between the protected speech and the adverse employment action. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996). Additionally, a plaintiff may demonstrate a causal connection "through evidence of retaliatory animus directed against the Plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000). In determining the existence of a causal connection between the protected speech and the alleged retaliatory action, the Court is mindful that "[c]ausation generally is a question for the finder of fact." *DePace,* 183 F.Supp.2d at 638.

Construing the Complaint's allegations in a light most favorable to the Plaintiff, the Court finds a sufficient factual predicate to permit a finding of a causal connection between Plaintiff's protected speech and the alleged retaliation. Plaintiff alleges that he began voicing his concerns about the SCPD in September 1999, and was immediately made aware that the SCPD wished him to remain silent. Plaintiff avers that, from September 1999 until November 2002 (the date of the first viable adverse employment action), he received warnings and veiled threats from SCPD officials as a result of his continuing complaints. While a significant time period (approximately three years) lapsed between the first instance of Plaintiff's protected speech and the first alleged retaliatory action, the sequence of events indicates an ongoing struggle between Plaintiff and the SCPD concerning his continuing allegations of malfeasance and non-feasance. This battle arguably culminated in the November 2002 adverse employment action, and the other alleged retaliations that followed. Assuming Plaintiff's allegations to be true, there is a sufficient basis for a reasonable jury to find a causal link between Plaintiff's speech and the Defendants' alleged retaliatory actions. *See Chertkova v. Conn. Life Ins.,* 92 F.3d 81, 90 (2d Cir.1996) (stating that the sequence of events is important in determining the existence of a causal connection in retaliation claim).

## B. *Plaintiff's Fourteenth Amendment Claim*

Plaintiff contends, albeit in summary fashion, that the same factual predicate for his First Amendment retaliation claim is sufficient to state an equal protection violation. Plaintiff maintains that he was singled out from other co-workers, impermissibly, because of his protected speech.

 In order to allege an equal protection claim, Plaintiff must allege "(1) he was treated differently than others similarly situated, and (2) such selective treatment was based on impermissible considerations, in this case his First Amendment rights." *DePace*, 183 F.Supp.2d at 639. Upon cursory examination, Plaintiff appears to have met this minimum pleading requirement.

However, the Second Circuit, in *Bernheim v. Litt*, held that the same facts supporting an alleged retaliation claim may not also serve as the predicate of an equal protection claim. 79 F.3d 318, 323 (2d Cir.1996). The court reasoned:

> The remaining harms that [plaintiff] sets forth in her equal protection claim are alleged to be the product, not of discrimination, but of retaliation for her complaints of discrimination. Although claims of retaliation are commonly brought under the First Amendment, and may also be brought under Title VII, we know of no court that has recognized a claim under the equal protection for retaliation following complaints of racial discrimination.... Accordingly, [plaintiff's] equal protection claim cannot stand.

*Id.* (Internal citations omitted); *see also Lange v. Town of Monroe*, 213 F.Supp.2d 411, 419 (S.D.N.Y.2002). The only fact differentiating *Bernheim* from this case is the subject matter of Plaintiff's speech; and the Court finds no principled basis for

limiting the Second Circuit's holding based on subject matter. *See Ratliff v. DeKalb County*, 62 F.3d 338, 340–41 (11th Cir. 1995) ("The right to be free from retaliation is clearly established as a *first amendment* right and as a *statutory* right under Title VII; but no clearly established right exists under the equal protection clause to be free from retaliation." (emphasis in original)); *see also Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir.2004); *Grossbaum v. Indianapolis–Marion County Bldg.*, 100 F.3d 1287, 1296 (7th Cir.1996). Accordingly, Plaintiff's equal protection claim predicated on Defendants' alleged retaliatory actions is DISMISSED.

## III. *Plaintiff's Monell Claims*

Defendants Suffolk County and SCPD ("Municipal Defendants") argue that Plaintiff has not alleged any policy or custom of denial of constitutional rights that would permit a finding of municipal liability. According to Defendants, the Complaint contains only "broad, simple and conclusory statements" and, thus, does not allege a sufficient basis for municipal liability. The Court disagrees. While the Complaint does not allege a widespread custom or practice of discrimination, it does contain sufficient allegations, which, if proven true, would support a claim for municipal liability.

 In order to impose liability against a municipality pursuant to 42 U.S.C. § 1983, a plaintiff must allege that the violation of his constitutional rights was part of a governmental custom, policy, ordinance, regulation or decision. *See Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Specifically, Plaintiff must plead three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983). Where a plaintiff simply alleges

"constitutional torts committed by city employees without official sanction," a claim for municipal liability must fail. *Amnesty*, 361 F.3d at 125.

A plaintiff may satisfy the *Monell* pleading criteria in several ways. For example, a plaintiff may allege that a municipality's official policy or ordinance is unconstitutional on its face; or that the ordinance is constitutional on its face, but "the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy.... Such circumstances may be found ... where the city is aware that its policy may be unconstitutionally applied by inadequately trained employees but the city consciously chooses not to train them." *Amnesty*, 361 F.3d at 125.

■ Where a plaintiff alleges that their constitutional rights have been violated by "a city employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself. Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers." *Id.* at 125–26; *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

■ Here, Plaintiff makes the following specific allegation concerning the Municipal Defendants:

Defendants [Suffolk County and the Suffolk County Police Department] have ... deprived plaintiff of his constitutional rights.... Defendants intentionally committed, condoned or were deliberately indifferent to aforementioned violations of plaintiff's constitutional rights. Such deliberate indifference may be inferred in the following ways: a) Defendants['] custom or practice of discriminating/retaliating against plaintiff based on his constitutionally protected forms of speech, expression and association. The discriminatory practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers. b) Supervisors failed to properly investigate and address allegations of retaliation and/or harassment. c) Inadequate training ... was so likely to result in the retaliation ... that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision. d) Policymakers engaged in and/or tacitly condoned the retaliation.

(Compl.¶ 38).

The Municipal Defendants accurately point out that Plaintiff has failed to allege any widespread practice or custom of abrogating employees' First Amendment rights. Most pertinent to this point, the Complaint references only the "Defendants['] ... custom or practice of discriminating ... against plaintiff based on *his* constitutionally protected forms of speech." (*Id.*) (emphasis added). There is no allegation that the Municipal Defendants have adopted an affirmative policy or custom of abrogating the protected speech of any other employees.

However, Plaintiff has alleged that supervisors failed to properly investigate his claims of retaliation, that inadequate training was so likely to lead to the retaliatory actions taken against him "that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision," and that policy makers, themselves, perpetrated or condoned the retaliations against him. Such pleading satisfies the minimum requirements of Rule 8. Accordingly, the

Municipal Defendants' motion to dismiss is DENIED.

## IV. *Qualified Immunity*

Having determined that Plaintiff has sufficiently alleged a § 1983 claim, the Court considers the Individual Defendants' (Abbott, Gallagher and Robilotto) claim of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (stating that the threshold question, before passing on qualified immunity, is whether plaintiff has alleged any constitutional violation).

■ Qualified immunity shields government officials from civil liability resulting from the performance of their discretionary functions only where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995). In order to establish entitlement to qualified immunity, the Defendants must demonstrate that either: (1) their actions did not clearly violate Plaintiff's First Amendment rights, or (2) it was objectively reasonable for them to believe their actions did not violate Plaintiff's First Amendment rights. *See Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.1996). The Court adds that, although "a qualified immunity defense may be advanced on a 12(b)(6) motion, it faces a 'formidable hurdle' when advanced at such an early stage in the proceedings." *The Cathedral Church of the Intercessor v. The Incorporated Village of Malverne*, 353 F.Supp.2d 375, 391 (E.D.N.Y.2005) (quoting *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004)).

At this stage, the Court denies the Individual Defendants' request for qualified immunity. As explained above, Plaintiff has sufficiently alleged conduct by the Individual Defendants that, if proven true, would constitute a violation of his well-established First Amendment rights. *See Szoke v. Carter*, 974 F.Supp. 360, 369 (S.D.N.Y.1997); *see also Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir.1993) (noting that "it was established prior to 1985 that government employees had a right under the First Amendment, though not an unlimited right, to speak on matters of public concern."). Moreover, the Individual Defendants' alleged actions cannot be considered objectively reasonable. For example, the Complaint contains allegations that the Individual Defendants issued veiled threats to Plaintiff, took retaliatory personnel actions against him, and/or permitted instances of improper retaliation against Plaintiff. Accordingly, the Individual Defendants' motion to dismiss Plaintiff's § 1983 claims on the grounds of qualified immunity is DENIED.

## V. *Plaintiff's Claims Against Abbott*

■ Finally, Defendant Abbott argues that Plaintiff's claims against him must be dismissed as untimely. According to Abbott, the Complaint's latest allegation with respect to his conduct concerns an incident occurring in September 2000, more than three years prior to the date this action was filed (June 23, 2004). Because New York applies a three-year statute of limitations period to § 1983 claims, Abbott contends that Plaintiff's claims against him are time-barred. *See Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir.1995).

Plaintiff maintains that the Complaint alleges Abbott's role in constitutional violations occurring much later than September 2000. Plaintiff relies on the Complaint's allegations concerning his inaccurate retirement application, his reinstatement to active duty, and the Internal Affairs investigation as sufficient pleading of Abbott's

constitutional violations. (Compl.¶¶ 27, 31, 32, 33, 35). Further, to the extent the Court limits the allegations relevant to Abbott's conduct to the events ending in September 2000, Plaintiff argues that the statute of limitations must be tolled due to the Defendants' "continuing violation" of his constitutional rights. *See Washington v. County of Rockland,* 373 F.3d 310, 318 (2d Cir.2004).

In order to state a claim against an individual defendant pursuant to 42 U.S.C. § 1983, a plaintiff must allege the defendant had "personal involvement" in the unconstitutional action. *See Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004). Where the target of a plaintiff's allegations is a supervisor, or other high ranking official, the Second Circuit has explained:

> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. Personal involvement can be shown by [ ] evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 127 (citations omitted).

Here, the Complaint makes the following references to Abbott:

James Abbott was during relevant times, an individual employed by the SCPD ... was the 1st Deputy Commissioner of the Suffolk County Police Department and therefore, was responsible for its maintenance and operation, including but not limited to, the hiring, firing, promotion and discipline of employees and all other employment related issues. Additionally, defendant Abbott was a policymaker for the SCPD, charged with the responsibility of insuring that employees were not subjected to unlawful retaliation or harassment. He was also responsible for properly training and supervising employees with respect to employment issues. Defendant Abbott worked in Suffolk County. (¶ 9.)

In or around the Summer of 1999, plaintiff had a conversation with the then Deputy Commissioner of the Suffolk County Police Department, Abbott. In this conversation, plaintiff spoke about ... issues of public concern.... (¶ 14.) Abbott told plaintiff, in or around the Summer of 1999, that as far as plaintiff's injuries were concerned, the SCPD would take care of plaintiff by placing him on the Commissioner's List.... In return, Abbott implied that he wanted plaintiff to forget about any of the ... issues he raised. (¶ 15.)

In or around late 1999 ... plaintiff told Abbott that serious issues of malfeasance existed within the SCPD. During this conversation, Abbott denied the promises ... previously made to plaintiff regarding the Commissioner's List and told plaintiff that Risk Management was retiring plaintiff. (¶ 16.)

In or around September 2000, in a meeting between plaintiff and Abbott, plaintiff raised issues [of public concern].... During the meeting, Abbott told plaintiff "we are not doing anything that will

make the police department look bad." Also, Abbott told plaintiff that the Department would not investigate plaintiff's claims. Abbott told plaintiff that he "dropped a bomb" on him.... Also ... Abbott told plaintiff words to the effect of "do something now, and lament it for a lifetime." ¶ 18.

While the specific references to Abbott cease after the alleged September 2000 conversation, there are sufficient allegations that Abbott was personally involved in the alleged retaliatory actions occurring after that date. Plaintiff avers that Abbott was a high ranking official and policy maker in the SCPD. Plaintiff avers that Abbott was familiar with, and responded negatively to Plaintiff's protected speech concerning the SCPD. Plaintiff further alleges that "during relevant times," Abbott was responsible for all SCPD employment decisions. Finally, Plaintiff maintains that Abbott (and the other Individual Defendants) "participated in and/or permitted the aforementioned harassment and/or retaliation to perpetuate, without abatement, in violation of plaintiff's constitutional ... rights." (Compl.¶ 40). Such allegations implicate Abbott, through non-feasance, in all the alleged retaliatory actions taken against Plaintiff listed in the Complaint. Accordingly, Abbott's contention that Plaintiff's claims against him are time barred is unavailing.[2]

## CONCLUSION

The Defendants' motion to dismiss is GRANTED, in part, and DENIED, in part.

Defendants' motion to dismiss Plaintiff's § 1983 claim alleging retaliation in viola-

tion of his First Amendment rights is DENIED.

Defendants' motion to dismiss Plaintiff's § 1983 claim alleging a violation of his Fourteenth Amendment equal protection rights is GRANTED. Plaintiff's Fourteenth Amendment claim is hereby DISMISSED, without prejudice.

Defendants' motion to dismiss Plaintiff's § 1983 claim alleging retaliation in violation of his First Amendment rights is DENIED.

SO ORDERED

---

**2.** Because the Court has determined that Plaintiff has failed to plead any adverse employment action prior to November 2002, the Court need not address the preservation of any claims that accrued in September 2000. Accordingly, the Court does not address the relevance of the tolling exception for "continuing violations."