Matthew **SALTARELLA**, Plaintiff,

v.

**TOWN OF ENFIELD**, Ronald Marcotte, Raymond Bouchard, Carl Sferrazza, and Scott Shanley, Defendants.

No. CIV. 3:04CV427 (JBA).

United States District Court,
D. Connecticut.

March 28, 2006.

John R. Williams, New Haven, CT, for Plaintiff.

Alan Raymond Dembiczak, Michael J. Rose, Robin B. Kallor, Howd & Ludorf, Hartford, CT, for Defendants.

*RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE [DOCS. # 48, 60]*

ARTERTON, District Judge.

Plaintiff Matthew Saltarella is a former police officer for the Town of Enfield who was terminated in June 2003. The defendants in this action are Ronald Marcotte (Enfield Chief of Police), Raymond Bouchard (Deputy Chief), Carl Sferrazza (Police Captain), and Scott Shanley (Town Manager and Director of Public Safety). Plaintiff's Revised Complaint [Doc. # 14],

asserts the following claims:[1] Equal Protection and Procedural Due Process claims[2] against defendants Marcotte, Bouchard, Sferrazza, and Shanley (Counts One through Four, respectively); First Amendment retaliation claims against the individual defendants (Counts Nine through Twelve); Equal Protection and Substantive Due Process claims against the Town of Enfield (Count Thirteen); intentional infliction of emotional distress claims against the individual defendants (Counts Fourteen through Seventeen); and defamation claims against defendants Marcotte, Bouchard and Sferrazza (Counts Eighteen through Twenty). Defendants have moved for summary judgment on all counts of the complaint. *See* Mot. for Summary Judgment [Doc. # 48]. For the reasons that follow, defendants' motion is granted on all constitutional claims, and supplemental jurisdiction is declined on the state common law claims.

## I. Factual Background

Saltarella was a police officer with the Enfield Police Department from November 1996 to June 2003, when he was terminated. Until October 2002 he received generally positive evaluations from his superiors, with discipline for some minor incidents. *See* Def. L.R. 56(a)1 Stmt. [Doc. # 49] ¶ 3; Pl. L.R. 56(a)2 Stmt. [Doc. # 54] ¶ 3; Saltarella Dep. [Doc. # 57, Ex. 1] 31–32.

In October 2002 plaintiff received two ten-day suspensions[3] for hav-

---

1. Plaintiff concedes that Counts Five through Eight alleging substantive due process violations against the individual defendants are barred by qualified immunity, *see* Brief in Opp. to Mot. for Summary Judgment [Doc. # 58] at 34, and therefore these counts will be deemed abandoned.

2. These counts are captioned only "Equal Protection," but contain allegations that plaintiff was deprived of the required pre-

termination hearing, and the parties appear to agree that plaintiff has alleged procedural due process claims in these counts.

3. Plaintiff claims that he was forced to accept these suspensions under circumstances which are immaterial to disposition of the summary judgment motion. *See* Saltarella Aff. ¶ 44. No grievance or appeal followed imposition of these ten-day suspensions.

ing what Chief Marcotte called an "inappropriate sexual relationship," *see* Marcotte Aff. ¶ 9, with Aimee Bernier, a volunteer fire fighter in North Thompsonville, Connecticut, whom plaintiff had arrested and transported for booking on third degree larceny charges related to allegations of embezzlement. Plaintiff acknowledged that he "did have a dating relationship with Ms. Bernier, and the relationship was entirely mutual and consensual," and that the two remained friends after their romantic relationship

ended. Saltarella Aff. [Doc. # 55] ¶ 39.[4] He also acknowledges that he was assigned to "pick her up and bring her to the police department for processing," after another officer obtained the larceny arrest warrant. *Id.* ¶ 35.[5]

Chief Marcotte initiated an internal affairs ("IA") investigation after the Chief of the North Thompsonville fire department called to complain that Bernier was being harassed by Saltarella.[6] Marcotte Aff. ¶ 5. Lieutenant Anjo Timmerman, who was as-

---

**4.** Defendants move to strike ¶¶ 5, 16, 23, 27–30, 47, 48, 52, 58, 65, 67 and 69 of plaintiff's affidavit, on the grounds that either they are not based on personal knowledge, state conclusions of law, or (in the case of ¶ 69) contradict plaintiff's deposition testimony. *See* Mot. to Strike and Mem. of Law in Support [Docs. # 60, 61]. The parts of ¶¶ 5, 16, 23, 27–30, 58 and 65 which state only plaintiff's belief that defendants acted maliciously or with retaliatory motive are "conclusory allegations" that are improper and will be stricken. *See Bell-South Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996). The motion to strike ¶ 47 concerning Aimee Bernier's relationship with Officer Vergean is granted, based on plaintiff's testimony that he had no personal knowledge of the nature of the relationship between Bernier and Vergean but only assumed they had one because Bernier performed a "strip show" for him and Vergean. Saltarella Dep. Vol. 2 [Doc. # 64, Ex. D] at 67. The motion to strike ¶¶ 48 and 67, which assert that Bernier's larceny arrest and Capt. Sferrazza's "hatred of me" were well known in the Enfield Police Department, is granted to the extent plaintiff purports to testify about what others knew, retaining the portion relating to his personal knowledge about the arrest and the animosity asserted. The motion to strike ¶ 52, concerning Steven Buck's discussions with Capt. Sferrazza, is granted on the grounds that plaintiff's report of this conversation is not based on his personal knowledge. Finally, the motion to strike ¶ 69, which lists other Enfield officers who plaintiff alleges falsified police reports but who were not fired, is granted because plaintiff testified at his deposition that he did "not know anybody who has falsified a police report, and I don't know anybody who has falsified a police report as far as I know,"

except for his allegations that Capt. Sferrazza made untrue statements during the disciplinary investigations of plaintiff. Saltarella Dep. 69–70. The Second Circuit "follow[s] the rule that 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997) (quoting *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996)); *see also Rubens v. Mason*, 387 F.3d 183, 192 (2d Cir.2004). Thus the challenged portions of ¶¶ 5, 16, 23, 27–30, 47, 52, 58, 65, and 69 will be stricken and will not form any basis for the Court's ruling.

**5.** Saltarella additionally acknowledges that he took Bernier on police "ride alongs," Saltarella Aff. ¶ 48, and states that he "never asked Ms. Bernier for any sexual favor in return for any accommodation," *id.* ¶ 68. He does not address Bernier's statements to Lt. Timmerman during the Internal Affairs investigation, which include that Saltarella took her to a bar after a ride-along, and "that on another occasion after Ms. Bernier went riding with Mr. Saltarella, Mr. Saltarella drove her in his car to a vacant lot, told her how beautiful she was, unzipped his pants, took out his penis, and pressured her into giving him oral sex." Timmerman Aff. ¶¶ 5(e)-(g).

**6.** Saltarella states that he "was never advised of any telephone call to defendant Marcotte from the Chief of the North Thompsonville Fire Department" and asserts that because there is no record in the relevant files he viewed documenting such a call, doubt is cast on its existence. Saltarella Aff. ¶ 33–34.

signed to the IA investigation by Marcotte, took Bernier's statement, and concluded that the relationship was "inappropriate," a characterization with which plaintiff disagreed. Timmerman Aff. ¶ 5(a)-(d). Timmerman also concluded that Saltarella had inappropriately discussed the investigation with other members of the police department leadership, after being instructed two times not to discuss it with anyone. *See id.* ¶¶ 5(r), (t). Saltarella disputes this conclusion as well, but acknowledges that he had some level of discussion about the IA investigation with Officer Vergean, Sergeant Droney and Chief Marcotte, and denies discussions with Officer Moylan. Saltarella Aff. ¶¶ 44, 45.

Six months later, in April 2003, Saltarella again was the subject of an IA investigation, which eventually led to his termination from the Enfield Police Department for falsifying a police report and dissembling to the IA investigator. The investigation resulted from an allegation by a civilian named Steven Buck that a statement in one of plaintiff's police reports was untrue. Buck had visited the police department to complain about the handling of his "habitual runaway" daughter's case. Sferrazza Aff. ¶ 4. Buck was directed to the officer in charge, Captain Sferrazza. *Id.* Sferrazza states that "Mr. Buck complained that Mr. Saltarella had not returned his calls. Mr. Buck also informed [Sferrazza] that Mr. Saltarella handled a number of other complaints involving his daughter." *Id.* ¶¶ 6–7. Sferrazza retrieved all the pertinent reports and showed them to Buck, who "reviewed the reports and noticed one that pertained to a previous harassment complaint filed in November 2002 by his ex-wife, Jeannie Buck[,] against Mr. Buck's girlfriend, Joyce Bialobrzeski." *Id.* ¶ 9. Mr. Buck told Sferrazza that the report was not true, because it stated that Saltarella told Joyce Bialobrzeski not to call Jeannie Buck,[7] but Saltarella never spoke directly to Bialobrzeski. *Id.* ¶ 10–11. Sferrazza reported this information to Deputy Chief Raymond Bouchard, *id.* ¶ 12, who spoke with Chief Marcotte and then "turned the matter over to the Detective Bureau to investigate." Bouchard Aff. ¶ 5.

Lt. Timmerman again conducted the IA investigation. He interviewed Steven Buck, who stated that on the evening of November 23, 2002, the date Jeannie Buck said Bialobrzeski threatened her, Saltarella called his house and told him that Jeannie Buck made a harassment complaint against Joyce Bialobrzeski and that Bialobrzeski should not call Ms. Buck. Mr. Buck "reported that he informed Mr. Saltarella that she [Bialobrzeski] was sitting right there and asked him whether he wanted to speak with her directly, and Mr. Saltarella told Mr. Buck that it was not necessary." Timmerman Aff. ¶ 7(b). Bialobrzeski also was interviewed and told Timmerman that she never spoke to Saltarella, and that she overheard Mr. Buck's end of the conversation in which Buck asked Saltarella if he wanted to speak to her. IA Investigation Report at 5–6. Jeannie Buck and her boyfriend also were interviewed, dispelling Steven Buck's in-

---

7. The police report, written by Saltarella and dated 12/9/2002, states that Jeannie Buck called police on 12/2/2002 complaining that she was threatened over the phone by Joyce Bialobrzeski on 11/23/2002. *See* Timmerman Aff. Ex. A at 1. Saltarella drove to Jeannie Buck's house and obtained a written statement, but the complainant declined to press charges. *Id.* "Jeannie requested that I [Saltarella] warn Joyce not to call Jeannie again in the future or face arrest for harassment. I called Joyce and advised her of Jeannie's wish that Joyce not call Jeannie at any time for any reason or she would be arrested. Joyce said she understood the warning." *Id.*

sinuations of an improper relationship between her and Saltarella. *Id.* at 8–9.

Timmerman interviewed Saltarella and the interview transcript shows that Saltarella repeatedly and firmly maintained that he had, in fact, spoken directly to Bialobrzeski over the phone on November 23. When Timmerman told him, "Well I have a tape here," [8] of the November 23 conversation showing that Saltarella only spoke to Buck on the phone, Saltarella backed away from his affirmative statements, saying "I don't remember. I truly don't remember. I thought I talked to Joyce. I remember making it clear to someone, maybe it was to Steven. I was sure that I talked to Joyce." *Id.* After further questioning, Saltarella admitted that he probably had not talked to Bialobrzeski that evening but may have spoken to her on another occasion. *Id.* at 15. Saltarella eventually acknowledged that he "warned Joyce through Steve" and that he never talked to Bialobrzeski. *Id.* at 20.

At the conclusion of the interview, when asked "[w]hy wouldn't you document the fact that the warning was given to a third party?" Saltarella responded, "[b]ecause she was there and he told her while she was standing there so I just figured that was the same as her being warned." *Id.* at 22. Timmerman asked whether Saltarella was "normally in the habit of putting things like this in report[s] where, in fact, they may not have occurred?" *Id.* at 21. Saltarella replied that sometimes he would neglect to mention the details, for example that he warned somebody by telephone rather than in person, or that he warned parents rather than children who got in trouble. When told that this was "not proper police procedure," Saltarella replied, "Yeah. I suppose I made a mistake on this one." *Id.* at 21–22.

Timmerman credited Buck's and Bialobrzeski's accounts, believing they had no motive or "personal vendetta" against Saltarella, and concluded that Saltarella was untruthful in the police report about this incident. *Id.* at 22–23. He characterized Saltarella as "trying to dodge" questions during his interview and "being very evasive." *Id.* at 23. He concluded that the false police report "casts a shadow of doubt on every other document Officer Saltarella is ever going to author again," *id.* and therefore recommended that Saltarella be disciplined for conduct unbecoming an officer, neglect/inattention to duty, and knowingly falsifying a report, and that he be given either a lengthy suspension or termination as a police officer. *Id.* at 23–24.

Chief Marcotte reviewed Timmerman's report and recommended to Town Manager Scott Shanley that Saltarella be terminated for falsifying a police report. Marcotte Aff. ¶ 14. On May 29, 2003, Shanley directed the town's human resources director to send a notice of a *Loudermill* hearing to Saltarella. Shanley Aff. ¶ 5. The notice, dated May 29, 2003, reads:

> Please be advised that a Loudermill hearing has been scheduled for June 5, 2003 at 10:00 a.m. at the Enfield Police Department. The purpose of this hearing is to afford you the opportunity to respond to the charges that you have violated the General Orders/Code of Conduct of the Enfield Police Department by your conduct on 12–9–02 in which you submitted false information in a police report and on 5–1–03 when you made false statements to a superior officer during an internal affairs investigation. You will be suspended with pay pending the results of the Loudermill hearing. . . .

8. This was a ploy by Timmerman as there was, in actuality, no such tape recording.

Letter from William Mahoney to Saltarella, Shanley Aff. Ex. A.

At the hearing, Saltarella was represented by a union attorney and a private attorney. Marcotte Aff. ¶ 7. When the hearing began, Shanley produced a copy of the IA report to Saltarella and his attorneys, initially allowing only "two (2) minutes to review the single copy of" the report, but then permitting a thirty minute recess after protest by counsel, and later rejecting a request for more time. *Id.* ¶¶ 13–14; Shanley Aff. ¶ 11. Saltarella asserts that "Defendant Marcotte failed to produce reports and records prior to the hearing" and, without giving specifics, also asserts that he was "unable to defend [him]self" as a result. Saltarella Aff. ¶ 12.

Shanley upheld Marcotte's recommendation and terminated Saltarella by letter dated June 13, 2003. Shanley Aff. ¶ 12; Ex. C. The letter lists the sections of the Enfield Police Department's General Orders that Saltarella was charged with violating, and recites that it was alleged that Saltarella falsified a police report when he reported that he phoned Bialobrzeski and warned her not to call Jeannie Buck, and that he later submitted false information during the IA investigation when he "repeatedly insisted that [he] spoke with Joyce, only to later recant and admit that [he] did not speak with her, but spoke with her boyfriend instead." *Id.* at 1. Shanley wrote that he was "disturbed" by the fact that Saltarella's incorrect report could have led to a false arrest, and by Saltarella's "lack of candor, which would certainly call into question any further police reports [he] would write and any testimony [he] might be required to give." *Id.* at 2. Shanley wrote that "[t]hese charges come after two (2) recent suspensions in December 2002 . . . The first was the result of an inappropriate relationship . . . with an arrestee of the Enfield Police Department,

and, the second, . . . failure to follow a direct order from a superior officer regarding the investigation of that incident." *Id.* at 1. Shanley wrote that when Saltarella's current violations were coupled with this recent prior discipline, Shanley was "convinced" that he had "no other alternative, but to terminate" Saltarella's employment effective immediately. *Id.* at 2.

Shanley further stated in the termination letter that he believed Saltarella's *Loudermill* rights had been protected because, after he was notified of the charges against him, he was given a thirty-minute recess to examine the IA documents, and that he was informed about the nature of the charges in the May 29 hearing notice as well. *Id.* at 2.

Saltarella argues that he was terminated in retaliation for a complaint he claims he had lodged previously about Captain Sferrazza's handling of a domestic violence incident, and a letter he wrote to Shanley "criticizing the unnecessary costs resulting from the maintenance of several fire department[s] within the town." Saltarella Aff. ¶ 26. Plaintiff has submitted no documentary evidence of any letter concerning fire departments nor of any pre-termination complaint he made about Sferrazza's conduct. Plaintiff's only documentary evidence is his written citizen's complaint filed with Deputy Chief Bouchard by e-mail eight months after he was terminated, in essence alleging that Sferrazza improperly used his authority in a domestic violence situation to protect the wife from arrest while ordering the arrest of her husband without probable cause. Plaintiff claims he refused to swear to the police report charging the husband with breach of peace, which is reflected in the report. Bouchard Aff. Ex. 3C. Saltarella claims that he verbally complained about Sferrazza's actions immediately after the events in question on April 29, 2002 to Sgt. Droney,

his immediate supervisor, then to Lt. Tobin, who "went immediately into the Captain's office." Saltarella Aff. ¶ 66. Tobin denies that Saltarella ever complained about Sferrazza's conduct in any domestic dispute investigation, or interference with any police investigation. Tobin Aff. ¶ 5. Sferrazza testified he knew nothing of plaintiff's "reservations about [the husband's arrest] until his termination hearing." Sferrazza Dep. 48.[9]

## H. Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir.2001) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The nonmoving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R.Civ.P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. *Id.* at 586, 106 S.Ct. 1348 (citations omitted).

## III. Discussion

### A. Equal Protection

 Plaintiff asserts a "class of one" claim under *Village of Willowbrook v.*

---

9. Deputy Chief Bouchard conducted an IA investigation into plaintiff's citizen complaint against Sferrazza and concluded that Sferrazza was correct in determining there was probable cause to arrest the husband and not the wife. Bouchard Aff. ¶ 6–8.

*Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam), which held that a plaintiff states an Equal Protection claim by pleading that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." To succeed on such a claim, "the level of similarity [proved] between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (citing *Purze v. Village of Winthrop Harbor,* 286 F.3d 452, 455 (7th Cir.2002) ("In order to succeed, the [plaintiffs] must demonstrate that they were treated differently than someone who is *prima facie* identical in all relevant respects.") (alteration in original)). Thus, the plaintiff's burden of proof is "to show that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson,* 409 F.3d at 105.

Plaintiff contends that defendants' treatment of him was irrational and arbitrary because he did not, in fact, lie in the Buck police report or have an inappropriate relationship with Bernier. *See* Brief in Opp. at 22–23. The equal protection issue, however, is whether plaintiff was irrationally treated differently from other similarly-situated officers who were suspected of committing similar violations. Plaintiff's

statements in his affidavit that three other similarly-situated officers were treated differently have been stricken, *see supra* n. 4, because he has shown no basis for his personal knowledge about what other officers allegedly did and what the resulting discipline was, in terms of either falsifying police reports or engaging in sexual conduct with arrestees. Plaintiff's identification of these officers is made only on the basis that he "was a veteran member of this small police department [and] did have personal knowledge of these facts," Br. in Opp. to Mot. to Strike [Doc. # 66] at 8, and that he "personally witnessed" one incident where a supervisor allegedly returned a report to Officer Murray because it was "not believable," Saltarella Aff. ¶ 69. He offered no supporting documentation from their personnel files or their depositions, which could have been obtained in discovery. As stated *supra* n. 4, plaintiff testified at his deposition that he did "not know anybody who has falsified a police report, and I don't know anybody who has falsified a police report as far as I know." Saltarella Dep. 69–70. "[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.,* 125 F.3d 55, 63 (2d Cir.1997) (internal citation and quotation marks omitted). Plaintiff's assertions, based apparently only on what he heard around the department and his conjecture that a report was returned for being "not believable," do not create a genuine issue of material fact warranting a jury trial.[10]

---

10. Chief Marcotte actually reviewed the IA files on the incidents involving all three officers and explained why these officers were not similarly-situated to plaintiff. Most importantly, none of the other officers had anything like two ten-day suspensions on their records. Marcotte Aff. ¶ 14. Officer Ludemann was accused of using excessive force and after initially denying the accusation "came forward on his own volition" and confessed, and "[h]ad he not come forward to tell the truth, his punishment would have been far

Since plaintiff has presented no admissible evidence of irrationally dissimilar treatment for similarly-situated Enfield police officers, defendants are entitled to summary judgment on plaintiff's Equal Protection claims in Counts One through Four and Thirteen.

## B. First Amendment Retaliation

■■■ To succeed on a First Amendment retaliation claim, the plaintiff must show that he is a public employee, that his speech "touch[ed] on a matter of public concern," that he suffered adverse employment action as a result of his speech, and that his right as a citizen in commenting upon matters of public concern outweighs the interest of his employer "in promoting the efficiency of the public services it performs through its employees." *City of San Diego v. Roe,* 543 U.S. 77, 81, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam) (internal quotation marks and citations omitted); *see also Mandell v. County of Suffolk,* 316 F.3d 368, 382 (2d Cir.2003) ("Before reaching th[e] balancing test a court must be satisfied that a plaintiff claiming First Amendment retaliation has demonstrated that: (1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination.") (internal quotation marks and citation omitted).

It is undisputed that plaintiff was a public employee and that he suffered an adverse employment action. The Court will assume, solely for the purpose of deciding this motion, that Saltarella's alleged complaints to Droney and Tobin about Sferrazza's handling of a domestic dispute arrest and investigation, and comment to Shanley about the costs of multiple fire departments, constitute matters of public concern.

Plaintiff fails, however, to produce any evidence from which any causal connection reasonably could be found between these complaints and his termination. While plaintiff maintains that he wrote a letter to Shanley "[p]rior to the events described" in his affidavit, "criticizing the unnecessary costs resulting from the maintenance of several fire department[s] within the town," Saltarella Aff. ¶ 26, there is no evidence at all that Shanley ever had any response to it or discussed or considered it in any way during the termination process.

Since plaintiff's written complaint about Sferrazza was submitted eight months after his termination, it clearly cannot support a retaliatory termination claim. The Court thus focuses only on plaintiff's evidence of pretermination oral complaints. Even construing the disputed evidence of the existence of such complaints in plaintiff's favor, Saltarella's causation evidence is merely that Sferrazza's "hatred of me because of my complaint against him was well known throughout the department." Saltarella Aff. ¶ 67. Saltarella offers no

more severe." Marcotte Aff. ¶ 8. The same officer was issued a two-day suspension for an accident involving his police cruiser, but was never accused of lying about his speed. *Id.* ¶ 9. A reference to Officer Murray being "less than truthful" in reporting an accident involving his police cruiser was deleted from his record after the Union filed a grievance and "it was not certain that [the Police Department] would prevail." *Id.* ¶ 12. Addi-

tionally, there was no accusation that Officer Murray's report about a motor vehicle pursuit, which was returned for revisions, was "not believable." *Id.* ¶ 11. In July 2003 Officer Driscoll was issued a four-day suspension for not being truthful during an IA investigation "about making a comment about [an] arrestee's appearance." *Id.* ¶ 13. There is no evidence that he was accused of writing and swearing to a false police report.

basis for his personal knowledge that Sferrazza's animosity resulted from Saltarella's complaint, of which Sferrazza denies any knowledge. Nor does plaintiff offer the testimony of others to whom Sferrazza may have said something indicative of such a connection. Saltarella's conclusory testimony would be inadmissible at trial. *See supra* n. 4 (striking that portion of ¶ 67). There is nothing in the record showing that Sferrazza ever reacted to or made any negative comment about plaintiff's complaint. Thus there is no evidence of any causal relationship between plaintiff's complaints to others and Sferrazza's role in plaintiff's termination.

Based on this record, no reasonable juror would have a sufficient basis to find "that [Saltarella's] speech [criticizing Sferrazza and Shanley] was a motivating factor in the determination" to terminate his employment. *See Mandell,* 316 F.3d at 382. Thus defendants are entitled to summary judgment on plaintiff's First Amendment retaliation claims in Counts Nine through Twelve.

### C. Procedural Due Process

Plaintiff contends that the defendants violated his right to procedural due process by failing to give him sufficient notice and opportunity to be heard at his termination proceeding on June 5, 2003. Before termination, a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). A "pretermination 'hearing,' though necessary, need not be elaborate," so long as the employee also has an opportunity "for a full post-termination hearing." *Id.* at 545, 546, 105 S.Ct. 1487; *see also Locurto v. Safir,* 264

F.3d 154, 171 (2d Cir.2001) ("When such a [tenured] public employee is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards.")

The first requirement, that an employee must be provided "oral or written notice of the charges against him," *Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487, was satisfied by the May 29, 2003 letter from the Enfield Director of Human Resources to Saltarella, which notified him that the subjects of the hearing were "false information in a police report" dated December 9, 2002 and "false statements to a superior officer during an internal affairs" interview on May 1, 2003. *See* Letter from Mahoney, Shanley Aff. Ex. A. Plaintiff had been shown a copy of his police report during the IA investigation, and knew that the veracity of his report that he warned Bialobrzeski not to contact Jeannie Buck was at issue. *See* IA Investigation Report at 9, 12–14.

*Loudermill* also requires "an explanation of the employer's evidence." *Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487. The Second Circuit has emphasized that mere "notice of the charge" should not be "equated … with disclosure of the evidence" against the accused employee. *Otero v. Bridgeport Hous. Auth.,* 297 F.3d 142, 152 (2d Cir.2002). In *Otero,* a public housing employee accused of stealing a Housing Authority toilet was summoned to several hearings and ultimately terminated, and at none of those hearings was she ever informed about the existence of affidavits of co-workers, including one which stated that the affiant had installed the missing toilet in the accused employee's house. *Id.* at 148. The Court of Appeals observed that had the employee "been shown that statement, she might have

been able to refute it simply by showing that the toilet in fact was not installed at her house...." *Id.* at 151. Had the accused employee been shown the statements of another witness, she would have had an opportunity to point out contradictions undermining that co-worker's credibility. *Id.* at 152. The Court of Appeals held that "[m]ere notice of the charge ... is not an explanation of the evidence and does not necessarily suffice to provide due process." *Id.*

This case is distinguishable from *Otero* in several respects. While Saltarella alleges that the full IA file was not produced to him until the June 5 hearing when he was permitted thirty minutes to read it, he was, nonetheless, afforded an opportunity to review the full IA file. This 58–page file contained only nine pages (and a set of duplicates) of interviews with witnesses Steven Buck, Joyce Bialobrzesky, Jeannie Buck and Alex Robler. There are three pages of Timmerman's summary and conclusions. With the exception of a business card and a brief letter to Steven Buck, the remaining materials were those with which Saltarella already was familiar: the transcript of his interview by Timmerman; his police report about the December 2, 2002 harassment complaint; a one-page notice he received on April 22, 2003 concerning the initiation of the IA investigation, and a one-page "Gerrity Warning" that he signed on May 1, 2003.

Plaintiff makes no showing that he was disadvantaged by denial of a further recess, beyond his conclusory statements that he "was unable to defend [him]self" and "was never given any opportunity to tell [his] side of the story." Saltarella Aff. ¶¶ 12, 60. He offers no evidence of what effect it likely would have had on the outcome had he been granted more than thirty minutes for review. He points to no other evidence or arguments he was pre-

cluded from raising as a result of defendants' refusal to extend the thirty-minute recess.

The thirty minutes allotted therefore has not been shown to have been so inadequate as to constitute a denial of plaintiff's right to disclosure of the evidence against him. Plaintiff's IA interview transcript demonstrates that he previously had been informed about the existence of interviews with Steven Buck and Bialobrzeski, and their substance, *i.e.*, that both witnesses said that plaintiff spoke only to Buck, not Bialobrzeski. Nothing in these witness statements is claimed to be exculpatory or capable of leading to exculpatory evidence.

Finally, *Loudermill* was premised "in part on the provisions in [the applicable state] law for a full post-termination hearing," 470 U.S. at 546, 105 S.Ct. 1487, and plaintiff "does not deny that the post-termination procedures provided by his union contract met the requirements of due process..." Br. in Opp. at 26; *see also* Labor Arbitration Award, 7/27/04, Marcotte Aff. Ex. E.

Saltarella's argument essentially boils down to the same contentions that underlie his First Amendment and Equal Protection claims, *i.e.*, his belief that the individuals conducting the hearing had it out for him. Despite his personal beliefs, as discussed above, there is insufficient evidence from which reasonable jurors could conclude that Shanley, Sferrazza or any other defendant acted with a retaliatory motive. Plaintiff offers nothing sufficiently refuting the evidence that he was afforded adequate notice of the charges against him prior to the June 5 hearing, adequate opportunity to review the evidence before the hearing began, and full post-termination review. For these reasons, plaintiff's procedural due process claim fails as a matter of law, and defendants are entitled to sum-

mary judgment on Counts One through Four of the complaint.[11]

## D. Substantive Due Process

 "[W]here another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of 'substantive due process.'" *Conn v. Gabbert*, 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *see also Velez v. Levy*, 401 F.3d 75, 93 (2d Cir.2005); *Kia P. v. McIntyre*, 235 F.3d 749, 757–58 (2d Cir.2000). For example, in *Velez*, 401 F.3d at 94, an elected Community School Board member alleged she was removed from her position based on trumped-up charges of criminal behavior made by other board members, who were retaliating against her for her political views. The Second Circuit held that the plaintiff did not state a separate substantive due process cause of action because "what would serve to raise defendant's actions [in falsifying charges against her] beyond the wrongful to the unconscionable and shocking are facts which, if proven, would constitute, in themselves, specific constitutional violations," such as First Amendment retaliation. *Id.*

Saltarella's substantive due process claim against the Town of Enfield raises no allegations beyond those already encompassed in his First Amendment, Equal Protection and Procedural Due Process claims, namely, that the defendants trumped up false charges against him in retaliation for his complaint about Sferraz-za's handling of a domestic violence arrest, that he was treated arbitrarily and irrationally because other officers who allegedly falsified police reports were not terminated as he was, and that he was given insufficient time to prepare his defense at his *Loudermill* hearing. All of these allegations raise claims under specific provisions of the Constitution, and therefore they "must be analyzed under the standard appropriate to th[ose] specific provision[s], not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

For this reason, Saltarella fails to state a substantive due process claim, and the Town is entitled to judgment as a matter of law on Count Thirteen.

## E. State Law Claims

Because the Court has dismissed plaintiff's constitutional claims, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims for defamation and intentional infliction of emotional distress. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim... if... the district court has dismissed all claims over which it has original jurisdiction...").

## IV. Conclusion

Accordingly, defendants' Motion for Summary Judgment [Doc. # 48] is GRANTED on Counts One through Thirteen, and supplemental jurisdiction is declined on Counts Fourteen through Twen-

---

11. Because the Court concludes that plaintiff has offered no competent evidence of constitutional violations on these counts, the individual defendants' argument that they are entitled to qualified immunity is not reached. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

ty, which are DISMISSED WITHOUT PREJUDICE. Defendants' Motion to Strike [Doc. # 60] is GRANTED IN PART AND DENIED IN PART as described above. The Clerk is directed to close this case.

IT IS SO ORDERED.