# CITY OF SAN DIEGO ET AL. *v.* ROE

No. 03–1669.   Decided December 6, 2004

PER CURIAM.

The city of San Diego (City), a petitioner here, terminated a police officer, respondent, for selling videotapes he made and for related activity. The tapes showed respondent engaging in sexually explicit acts. Respondent brought suit alleging, among other things, that the termination violated his First and Fourteenth Amendment rights to freedom of speech. The United States District Court for the Southern District of California granted the City's motion to dismiss. The Court of Appeals for the Ninth Circuit reversed.

The petition for a writ of certiorari is granted, and the judgment of the Court of Appeals is reversed.

I

Respondent John Roe, a San Diego police officer, made a video showing himself stripping off a police uniform and masturbating. He sold the video on the adults-only section of eBay, the popular online auction site. His username was "Code3stud@aol.com," a wordplay on a high priority police radio call. 356 F. 3d 1108, 1110 (CA9 2004). The uniform apparently was not the specific uniform worn by the San Diego police, but it was clearly identifiable as a police uniform. Roe also sold custom videos, as well as police equipment, including official uniforms of the San Diego Police Department (SDPD), and various other items such as men's underwear. Roe's eBay user profile identified him as employed in the field of law enforcement.

Roe's supervisor, a police sergeant, discovered Roe's activities when, while on eBay, he came across an official SDPD police uniform for sale offered by an individual with the username "Code3stud@aol.com." He searched for other items Code3stud offered and discovered listings for Roe's videos depicting the objectionable material. Recognizing Roe's picture, the sergeant printed images of certain of Roe's offerings and shared them with others in Roe's chain of command, including a police captain. The captain notified the SDPD's

internal affairs department, which began an investigation. In response to a request by an undercover officer, Roe produced a custom video. It showed Roe, again in police uniform, issuing a traffic citation but revoking it after undoing the uniform and masturbating.

The investigation revealed that Roe's conduct violated specific SDPD policies, including conduct unbecoming of an officer, outside employment, and immoral conduct. When confronted, Roe admitted to selling the videos and police paraphernalia. The SDPD ordered Roe to "cease displaying, manufacturing, distributing or selling any sexually explicit materials or engaging in any similar behaviors, via the internet, U. S. Mail, commercial vendors or distributors, or any other medium available to the public." *Id.*, at 1111 (internal quotation marks omitted). Although Roe removed some of the items he had offered for sale, he did not change his seller's profile, which described the first two videos he had produced and listed their prices as well as the prices for custom videos. After discovering Roe's failure to follow its orders, the SDPD—citing Roe for the added violation of disobedience of lawful orders—began termination proceedings. The proceedings resulted in Roe's dismissal from the police force.

Roe brought suit in the District Court pursuant to Rev. Stat. § 1979, 42 U. S. C. § 1983, alleging that the employment termination violated his First Amendment right to free speech.· In granting the City's motion to dismiss, the District Court decided that Roe had not demonstrated that selling official police uniforms and producing, marketing, and selling sexually explicit videos for profit qualified as expression relating to a matter of "public concern" under this Court's decision in *Connick* v. *Myers,* 461 U. S. 138 (1983).

In reversing, the Court of Appeals held Roe's conduct fell within the protected category of citizen commentary on matters of public concern. Central to the Court of Appeals' conclusion was that Roe's expression was not an internal work-

place grievance, took place while he was off duty and away from his employer's premises, and was unrelated to his employment. 356 F. 3d, at 1110, 1113–1114.

## II

A government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment. See, *e. g.*, *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589, 605–606 (1967). On the other hand, a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public. The Court has recognized the right of employees to speak on matters of public concern, typically matters concerning government policies that are of interest to the public at large, a subject on which public employees are uniquely qualified to comment. See *Connick, supra; Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563 (1968). Outside of this category, the Court has held that when government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification "far stronger than mere speculation" in regulating it. *United States* v. *Treasury Employees*, 513 U. S. 454, 465, 475 (1995) *(NTEU)*. We have little difficulty in concluding that the City was not barred from terminating Roe under either line of cases.

## A

In concluding that Roe's activities qualified as a matter of public concern, the Court of Appeals relied heavily on the Court's decision in *NTEU*. 356 F. 3d, at 1117. In *NTEU* it was established that the speech was unrelated to the employment and had no effect on the mission and purpose of the employer. The question was whether the Federal Government could impose certain monetary limitations on outside

earnings from speaking or writing on a class of federal employees. The Court held that, within the particular classification of employment, the Government had shown no justification for the outside salary limitations. The First Amendment right of the employees sufficed to invalidate the restrictions on the outside earnings for such activities. The Court noted that throughout history public employees who undertook to write or to speak in their spare time had made substantial contributions to literature and art, 513 U. S., at 465, and observed that none of the speech at issue "even arguably [had] any adverse impact" on the employer, *ibid.*

The Court of Appeals' reliance on *NTEU* was seriously misplaced. Although Roe's activities took place outside the workplace and purported to be about subjects not related to his employment, the SDPD demonstrated legitimate and substantial interests of its own that were compromised by his speech. Far from confining his activities to speech unrelated to his employment, Roe took deliberate steps to link his videos and other wares to his police work, all in a way injurious to his employer. The use of the uniform, the law enforcement reference in the Web site, the listing of the speaker as "in the field of law enforcement," and the debased parody of an officer performing indecent acts while in the course of official duties brought the mission of the employer and the professionalism of its officers into serious disrepute. 356 F. 3d, at 1111 (internal quotation marks omitted).

The Court of Appeals noted the City conceded Roe's activities were "unrelated" to his employment. *Id.*, at 1112, n. 4. In the context of the pleadings and arguments, the proper interpretation of the City's statement is simply to underscore the obvious proposition that Roe's speech was not a comment on the workings or functioning of the SDPD. It is quite a different question whether the speech was detrimental to the SDPD. On that score the City's consistent position has been that the speech is contrary to its regulations and harmful to the proper functioning of the police force. The pres-

ent case falls outside the protection afforded in *NTEU*. The authorities that instead control, and which are considered below, are this Court's decisions in *Pickering, supra, Connick*, 461 U. S. 138, and the decisions which follow them.

## B

To reconcile the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission, the *Pickering* Court adopted a balancing test. It requires a court evaluating restraints on a public employee's speech to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U. S., at 568; see also *Connick, supra*, at 142.

Underlying the decision in *Pickering* is the recognition that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. See 391 U. S., at 572. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.

*Pickering* did not hold that any and all statements by a public employee are entitled to balancing. To require *Pickering* balancing in every case where speech by a public employee is at issue, no matter the content of the speech, could compromise the proper functioning of government offices. See *Connick, supra*, at 143. This concern prompted the Court in *Connick* to explain a threshold inquiry (implicit in *Pickering* itself) that in order to merit *Pickering* balancing, a public employee's speech must touch on a matter of "pub-

lic concern." 461 U. S., at 143 (internal quotation marks omitted).

In *Connick*, an assistant district attorney, unhappy with her supervisor's decision to transfer her to another division, circulated an intraoffice questionnaire. The document solicited her co-workers' views on, *inter alia*, office transfer policy, office morale, the need for grievance committees, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. See *id.*, at 141.

Finding that—with the exception of the final question— the questionnaire touched not on matters of public concern but on internal workplace grievances, the Court held no *Pickering* balancing was required. 461 U. S., at 141. To conclude otherwise would ignore the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.*, at 143. *Connick* held that a public employee's speech is entitled to *Pickering* balancing only when the employee speaks "as a citizen upon matters of public concern" rather than "as an employee upon matters only of personal interest." 461 U. S., at 147.

Although the boundaries of the public concern test are not well defined, *Connick* provides some guidance. It directs courts to examine the "content, form, and context of a given statement, as revealed by the whole record" in assessing whether an employee's speech addresses a matter of public concern. *Id.*, at 146–147. In addition, it notes that the standard for determining whether expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy is present. *Id.*, at 143, n. 5. That standard is established by our decisions in *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975), and *Time, Inc.* v. *Hill*, 385 U. S. 374, 387–388 (1967). These cases make clear that public concern is something that is a

subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication. The Court has also recognized that certain private remarks, such as negative comments about the President of the United States, touch on matters of public concern and should thus be subject to *Pickering* balancing. See *Rankin* v. *McPherson*, 483 U. S. 378 (1987).

Applying these principles to the instant case, there is no difficulty in concluding that Roe's expression does not qualify as a matter of public concern under any view of the public concern test. He fails the threshold test and *Pickering* balancing does not come into play.

*Connick* is controlling precedent, but to show why this is not a close case it is instructive to note that even under the view expressed by the dissent in *Connick* from four Members of the Court, the speech here would not come within the definition of a matter of public concern. The dissent in *Connick* would have held that the entirety of the questionnaire circulated by the employee "discussed subjects that could reasonably be expected to be of interest to persons seeking to develop informed opinions about the manner in which . . . an elected official charged with managing a vital governmental agency, discharges his responsibilities." 461 U. S., at 163 (opinion of Brennan, J.). No similar purpose could be attributed to the employee's speech in the present case. Roe's activities did nothing to inform the public about any aspect of the SDPD's functioning or operation. Nor were Roe's activities anything like the private remarks at issue in *Rankin*, where one co-worker commented to another co-worker on an item of political news. Roe's expression was widely broadcast, linked to his official status as a police officer, and designed to exploit his employer's image.

The speech in question was detrimental to the mission and functions of the employer. There is no basis for finding that it was of concern to the community as the Court's cases have

understood that term in the context of restrictions by governmental entities on the speech of their employees.

The judgment of the Court of Appeals is

*Reversed.*