**NOT PRECEDENTIAL**

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3522
_____

GEORGE F. EMIGH,

Appellant

v.

SUSANNE STEFFEE; JEFFREY MILLER; ALLISON JACOBS;
JOSHUA GIRAN; HARVEY COLE; LT. COL. JOHN BROWN; LT. JAMES
FULMER; DAVID REESE; LISA CHRISTIE

_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-08-CV-1726)
District Judge: Honorable Nora Barry Fischer
_____

Submitted Under Third Circuit LAR 34.1(a)
May 12, 2011

Before: SMITH, CHAGARES AND VANASKIE, *Circuit Judges*

(Filed:  August 2, 2011)
_____

OPINION
_____

VANASKIE, *Circuit Judge*.

George F. Emigh, a former Pennsylvania State Police ("PSP") Sergeant, appeals

District Court rulings that rejected Emigh's First Amendment retaliation claims.  For

essentially the same reasons articulated by the District Court in its comprehensive and thoughtful decisions, we will affirm.

I.

As we write solely for the parties, we relate only those facts necessary to our analysis. On December 19, 2008, Emigh filed this action under 42 U.S.C. § 1983 against Appellees Magisterial District Judge Susan Steffee, PSP Commissioner Jeffery Miller, PSP Deputy Commissioner John Brown, and the following PSP officers: Captain Harvey Cole, Captain Lisa Christie, Lieutenant James Fulmer, Corporal David Reese, Trooper Allison Jacobs, and Trooper Joshua Giran.[1] The event that triggered the lawsuit occurred in October 2004, at an Indiana Barracks, PSP sponsored "wings party," attended by both station members and the public. At the party, Emigh allegedly grabbed Magisterial District Judge Steffee's backside, pulled her against him, and French kissed her. Offended and embarrassed, Steffee immediately exited the party.

Approximately one and one-half years later, on June 6, 2006, Emigh, as the direct supervisor of Trooper Jacobs, completed a review of her performance. In the performance review, Emigh designated five areas where Jacobs needed to show improvement. Subsequently, on June 8, 2006, Steffee, who is purported to be Jacobs' friend, filed a complaint with Lieutenant Fulmer against Emigh, alleging that he committed sexual misconduct at the October 2004 party. At some point in the summer of 2006, Emigh was notified about the complaint.

---

[1] On March 1, 2011, a two-judge panel of this Court granted Steffee's motion to be excused from filing a brief.

On or about August 30, 2006, while investigating the complaint, Corporal Reese e-mailed Trooper Giran concerning the matter. Giran, Jacobs' alleged boyfriend, wrote that he did not witness any inappropriate behavior at the party. When interviewed on October 6, 2006, however, Giran allegedly stated that Emigh committed the charged misconduct.

In October 2006, in the midst of the Steffee investigation, Emigh obtained two photocopied pages from supervisor Corporal Frank Adamczyk's notebook. The notes indicated that, at some time before the Steffee complaint was filed, Lieutenant Fulmer had made derogatory remarks about Emigh, and suggested that Emigh should be relieved of his duties. On October 5, 2006, Emigh filed a Bureau of Professional Responsibility ("BPR") complaint with PSP internal affairs against Fulmer. The BPR complaint alleged that Steffee and Fulmer made similar allegations against Emigh, and that he believed that Adamczyk's notes raised "issues of credibility" as to the Steffee complaint submitted by Fulmer. (A. 80.) Fulmer was investigated and internal affairs concluded that the allegations were unfounded. (*Id.*)

Emigh was interviewed on three occasions concerning the Steffee complaint. First, on October 11, 2006, Reese read Emigh his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and conducted an interview. Although he admitted to kissing Steffee, Emigh denied grabbing her. Next, on December 18, 2006, he was interviewed concerning the Steffee matter as well as additional allegations made by Jacobs and Giran. Finally, on January 17, 2007, Emigh was questioned again by Reese. At this interview, Emigh asserts, without elaboration, that he informed Reese that Reese had erroneously

3

recorded Emigh's original statement, but Reese failed to correct the error in his final report. Emigh further claims that in a March 24, 2007 letter to Captain Christie, he again notified Christie that his original statement was incorrectly recorded.

On March 7, 2007, Captain Cole, Emigh's commanding officer, issued a summary report of the investigation, finding that the allegations against Emigh had been sustained. The report stated that Emigh had grabbed Steffee's buttocks, and that Jacobs and Giran corroborated Steffee's version of the facts. Cole informed Christie, the departmental disciplinary officer, of the report's findings. Cole then recommended to Deputy Commissioner Brown that Emigh be court-martialed. Brown agreed. Thereafter, on March 16, 2007, Cole informed Emigh that a Disciplinary Action Report had been filed against him. Additionally, at this same meeting, Captain Cole allegedly told Emigh that Steffee had a "private agenda" against him. (A. 83.) On or around May 23, 2007, Cole placed Emigh on restricted status. On or around that same day, Emigh signed a Member's Selection of Procedure form, opting to have his case heard before an arbitrator, rather than a court-martial, pursuant to his union's collective bargaining agreement.[2]

On June 19, 2007, Captain Christie issued a Notice of Disciplinary Penalty to Emigh that imposed a thirty-five-day suspension without pay and an inter-troop transfer. Because he planned to retire on July 13, 2007, Emigh asked that his suspension be stayed until his retirement date. Cole denied this request, and Emigh was suspended on June 25, 2007.

---

[2] Emigh claims that, on an unspecified date, he requested a polygraph test, which Brown denied.

On July 2, 2007, Emigh filed a grievance with his union to appeal the discipline imposed upon him. Again, he denied grabbing Steffee, but admitted sharing a mutual kiss with her. (A. 291.) Emigh further claimed that Steffee's complaint was a lie and that it was lodged in retaliation for Jacobs' unfavorable employment evaluation. On July 18, 2007, Emigh filed another grievance because he was informed that he would lose his state-paid medical benefits during his suspension period, unless he paid for them.[3] (*Id.* at 292.)

Meanwhile in July 2007, Emigh was the subject of a separate internal investigation concerning his involvement in a property dispute between Emigh's acknowledged friend and the friend's former business partner. The allegations were sustained based upon a finding that Emigh conducted a biased investigation, and had violated "several" department procedures. (*Id.* at 286.) Emigh retired before discipline could be imposed on those charges.

After serving his suspension, Emigh was transferred to the Belle Vernon PSP Barracks. On August 24, 2007, he retired.

Emigh asserts that he was denied an honorable discharge in retaliation for having grieved the disciplinary sanction arising out of the Steffee complaint. The Commissioner, on the recommendation of the Deputy Commissioner, determines whether an honorable discharge is warranted. To this end, the Human Resources Bureau provides

---

[3] Although Emigh maintains that he did not wish to settle his grievances, on December 7, 2007, he was informed that his Pennsylvania State Troopers Association ("PSTA") counsel and the Commonwealth of Pennsylvania agreed to reduce his suspension to fourteen days, to provide backpay for twenty-one days, and to reimburse the costs of his benefits.

5

the Deputy Commissioner with a report, usually on a monthly basis, concerning the previous month's retirees. The report contains information from the Department of Discipline, the Bureau of Integrity and Professional Standards (which includes the Internal Affairs Division and Human Resources Bureau), and summarizes a retiree's disciplinary and misconduct history. As to Emigh specifically, Brown observed that he had committed a court-martialed offense involving sexual misconduct, and that he had received a thirty-five-day suspension without pay and an inter-troop transfer. Further, he had received a Disciplinary Action Report in July 2007 for a sustained charge of misconduct concerning a biased investigation involving a friend. Thus, because of the sustained misconduct charges, including one rising to the level of a court-martial offense, Brown recommended to Miller that Emigh be denied an honorable discharge. Miller agreed with Brown's assessment, and ultimately found that Emigh did not qualify for an honorable discharge.

In his Complaint, Emigh alleges that his First and Fourteenth Amendment rights were violated because he was retaliated against for giving Jacobs a poor performance review, for filing a BPR complaint with the Internal Affairs Department of the PSP against Fulmer, and for filing grievances with his PSP union. Further, Emigh avers that his grievance was settled by the PSTA attorney without his consent, and that he was not reimbursed "for the costs be [sic] due to an unlawful, involuntary, disciplinary transfer." (*Id.* at 76.)

On March 9, 2009, the PSP Appellees filed a motion to dismiss for failure to state a cognizable claim. Shortly thereafter, on March 16, 2009, both Fulmer and Steffee filed

6

separate motions to dismiss. On May 27, 2009, the District Court issued a Memorandum Opinion, granting in part the motions to dismiss. Specifically, the District Court dismissed Emigh's First Amendment retaliation claims arising from his review of Trooper Jacobs' performance in view of Emigh's concession that "Jacobs' review [was] not the basis for his First Amendment claim." (*Id.* at 60.) As to the BPR complaint against Fulmer, the District Court found that it did not involve a matter of public concern, so it was unprotected under the First Amendment's Free Speech Clause. Further, the court also found that the matter was not protected under the Petition Clause of the First Amendment because it did not seek redress of grievances from the government. The District Court did conclude, however, that Emigh's filing of two grievances through the PTSA constituted protected speech under the Petition Clause, and that he sufficiently pleaded a retaliation claim against Miller and Brown for their decision to deny him an honorable discharge upon his retirement in retaliation for the grievances. Finally, the District Court dismissed Emigh's Fourteenth Amendment procedural due process claim because his "own [C]omplaint demonstrate[d]" that he was given adequate notice and procedures to satisfy his due process rights. Accordingly, the sole claim to survive the motions to dismiss was Emigh's First Amendment Petition Clause retaliation claim against Brown and Miller.

The District Court's case management order established December 1, 2009 as the discovery deadline. On December 2, 2009, during a telephonic status conference, Emigh informed the court that he wanted information from the computer of Fulmer, who had already been dismissed from the case. On January 20, 2010, Emigh moved to extend the

7

discovery deadline. Although the court denied the motion on January 29, 2010, it ordered the PSP Appellees to produce Fulmer's computer files, subject to a stipulated confidentiality agreement and protective order. On February 12, 2010, after the District Court was notified that Fulmer's computer files had been produced to Emigh, the court closed discovery and set a deadline for motions for summary judgment.

On February 25, 2010, Brown and Miller, the only remaining parties, timely moved for summary judgment and Emigh filed a brief in opposition. On July 23, 2010, the District Court granted the motion for summary judgment in favor of Brown and Miller. Specifically, the District Court found that the undisputed facts established that the filing of the grievances was not a substantial or motivating factor in the denial of an honorable discharge, and, in any event, Brown and Miller demonstrated that they would have terminated Emigh regardless of his filing of the grievances.

On appeal, Emigh challenges three of the District Court's rulings. First, he claims that the District Court erred in dismissing his First Amendment Free Speech Clause retaliation claim based upon the BPR complaint. Second, he assails the District Court's grant of summary judgment as to his First Amendment Petition Clause claim for the filing of two union grievances and the purported retaliation by Brown and Miller. Finally, he asserts that the District Court abused its discretion by denying his motion to extend the discovery period. [4]

---

[4] Emigh did not argue that the District Court erred in dismissing any of his other claims. As such, he has waived any challenge to the entry of judgment on his First Amendment retaliation claim based on the Jacobs' evaluation, the First Amendment Petition Clause retaliation claim premised on the BPR worksheet, and the Fourteenth

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and we have jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's grant of a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and a motion for summary judgment under Federal Rule of Civil Procedure 56 is plenary. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005) (summary judgment); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996) (motion to dismiss). "We apply the abuse of discretion standard when reviewing orders regarding the scope and conduct of discovery." *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1310 (3d Cir. 1995).

## A.

"In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). A public employee's speech is protected when: (1) the employee spoke as a citizen; (2) the statement involved a matter of public concern; and (3) the government employer lacked a sufficient reason for treating the employee differently from another member of the general public. *Garcetti v.*

---

Amendment due process claim. *See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief[.]").

*Ceballos*, 547 U.S. 410, 418 (2006); *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006).

The District Court found, as a matter of law, that Emigh's BPR complaint involved a matter of personal, rather than public, concern. As the District Court noted, the BPR complaint attacked Fulmer's credibility, and "related solely to alleged misconduct in the handling [of] an internal complaint filed against Plaintiff by Fulmer concerning the Steffee incident." (A. 62.) Emigh's professional reputation was at stake, and he had a highly personal interest in filing the BPR complaint. Accordingly, the District Court found that Emigh's speech was not protected under the First Amendment.

Emigh argues that his BPR complaint involved a matter of public concern. Also, he submits that, under *Garcetti*, whether speech is protected involves a "fact-based inquiry," rather than a question of law. (Appellant's Br. at 17.) Emigh's claims are unpersuasive.

As the District Court correctly observed, Emigh did not indicate that he wanted the public to learn of Fulmer's purported misconduct. The BPR complaint was filed *internally* with the PSP, and handled in accordance with the PSP's internal operating procedures. As we explained in *Gorum v. Sessoms*, 561 F.3d 179, 187 (3d Cir. 2009), a public employee's internal complaint is not protected by the First Amendment where "[t]here is no evidence in the record that [the employee] even made a public statement[, and] [t]here is no proof that he thought any public policy issues were at stake." Moreover, "assuming that [Emigh] even raised matters of public concern . . . , [w]e cannot 'cherry pick' something that may impact the public while ignoring the manner and

10

context in which that statement was made or that public concern expressed." *Id.* (quotation marks omitted; brackets in original). Furthermore, as we noted in *Hill v. Borough of Kutztown*, decided after *Garcetti*, whether "the activity in question is protected by the First Amendment . . . is a question of law . . . ." *Hill*, 455 F.3d at 241. Accordingly, the District Court properly granted the Appellees' motions to dismiss Emigh's First Amendment Free Speech claim based upon the BPR complaint.

B.

Recently, in *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488 (2011), the Supreme Court abrogated *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir. 1994), and held that the public concern test applies to retaliation actions brought under the Petition Clause.[5] In that case, Guarnieri claimed that the borough retaliated against him for filing

---

[5] The Supreme Court stated:

> If a public employee petitions as an employee on a matter of purely private concern, the employee's First Amendment interest must give way, as it does in speech cases. *Roe*, 543 U.S., at 82–83, 125 S. Ct. 521. When a public employee petitions as a citizen on a matter of public concern, the employee's First Amendment interest must be balanced against the countervailing interest of the government in the effective and efficient management of its internal affairs. *Pickering*, supra, at 568, 88 S. Ct. 1731. If that balance favors the public employee, the employee's First Amendment claim will be sustained. If the interference with the government's operations is such that the balance favors the employer, the employee's First Amendment claim will fail even though the petition is on a matter of public concern.

*Guarnieri*, 131 S. Ct. at 2500.

11

two petitions: a union grievance challenging his termination, and a second union grievance disputing directives issued by the borough council after Guarnieri was reinstated. *Guarnieri*, 131 S. Ct. at 2492. The Court observed:

> The substantial government interests that justify a cautious and restrained approach to the protection of speech by public employees are just as relevant when public employees proceed under the Petition Clause. Petitions, no less than speech, can interfere with the efficient and effective operation of government. A petition may seek to achieve results that "contravene governmental policies or impair the proper performance of governmental functions." *Garcetti*, 547 U.S., at 419, 126 S. Ct. 1951. Government must have authority, in appropriate circumstances, to restrain employees who use petitions to frustrate progress towards the ends they have been hired to achieve. A petition, like other forms of speech, can bring the "mission of the employer and the professionalism of its officers into serious disrepute." *Roe*, 543 U.S., at 81, 125 S. Ct. 521. A public employee might, for instance, use the courts to pursue personal vendettas or to harass members of the general public. That behavior could cause a serious breakdown in public confidence in the government and its employees. And if speech or petition were directed at or concerned other public employees, it could have a serious and detrimental effect on morale.

*Id.* at 2495-96.

In his first grievance, Emigh denied that he grabbed Steffee, and he alleged that she retaliated against him because Jacobs received a poor employment review. In the second grievance, Emigh asked to be reimbursed for medical expenses incurred while he was suspended. Clearly, Emigh's grievances did not address a matter of public concern. Instead, they raised only the correctness of disciplinary findings and the consequences of

12

the disciplinary suspension.  Furthermore, the grievances did "not seek to communicate to the public or to advance a political or social point of view beyond the employment context."  *Id.* at 2501.  Accordingly, the grievances cannot form the predicate for a First Amendment retaliation claim.

Even if Emigh's grievances were protected activity under the First Amendment, the District Court correctly concluded that Brown and Miller were entitled to judgment in their favor.  Brown and Miller both testified that they were unaware of Emigh's grievances when determining whether or not to grant him an honorable discharge.  Rather, Emigh's disciplinary history and misconduct were the only information reviewed by Brown and Miller.  Significantly, Emigh failed to produce any evidence that Brown and Miller were *aware* of his grievances.  *See Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct.").  In this context, Emigh's claimed protected activities could not be substantial factors in the decision denying him an honorable discharge.  Accordingly, the District Court did not err in granting summary judgment.[6]

C.

Emigh also claims that the District Court erred by denying his motion to enlarge the discovery deadline, and he speculates that information concerning the homicide

---

[6] Because we find that Emigh failed to meet his burden of proving his grievances were a substantial or motivating factor in the decision to deny an honorable discharge, we need not decide whether Brown and Miller would have taken the same action regardless of the filing of the grievances.

investigation of a non-party PSP Trooper, "who had a relationship with Fulmer," would have aided his lawsuit. (Appellant's Br. at 23.) Emigh "ha[s] a heavy burden to bear, however, as matters of docket control and conduct of discovery are committed to the sound discretion of the district court." *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982). "[W]e will not upset a district court's conduct of discovery procedures absent a demonstration that the court's action made it impossible to obtain crucial evidence, and implicit in such a showing is proof that more diligent discovery was impossible." *Id.* (quotation marks omitted).

We find no abuse of discretion. If anything, the District Court went out of its way to accommodate Emigh, as it ordered the production of Fulmer's computer files after the discovery deadline had passed.

### III.

For the foregoing reasons, we will affirm the Judgment of the District Court.