[Cite as *Rodriguez v. Greater Dayton Regional Transit Auth.*, 2013-Ohio-3463.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

ELLEN RODRIGUEZ                          :

     Plaintiff-Appellant               :               C.A. CASE NO.    25583

v.                                       :               T.C. NO.    11CV9281

GREATER DAYTON REGIONAL           :                    (Civil appeal from
TRANSIT AUTHORITY, et al.                                Common Pleas Court)
                                         :
     Defendants-Appellees
                                         :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the _____9th_____ day of _____August_____, 2013.

· · · · · · · · · ·

JOHN R. FOLKERTH, JR., Atty. Reg. No. 0016366 and KENNETH J. HEISELE, Atty.
Reg. No. 0078827, 109 N. Main Street, 500 Performance Place, Dayton, Ohio 45402
     Attorneys for Plaintiff-Appellant

DWIGHT A. WASHINGTON, Atty. Reg. No. 0018776 and BEVERLY A. MEYER, Atty.
Reg. No. 0063807, 118 W. First Street, Suite 850, Dayton, Ohio 45402
     Attorneys for Defendants-Appellees

· · · · · · · · · ·

FROELICH, J.

{¶ 1}   Ellen Rodriguez appeals from a judgment of the Montgomery County

Court of Common Pleas, which granted summary judgment to the Greater Dayton Regional Transit Authority (RTA), Mark Donaghy, and Allison Ledford on Rodriguez's claim that she was discharged from her employment with RTA in retaliation for exercising her right to free speech. For the following reasons, the trial court's judgment will be affirmed.

### I. Factual and Procedural Background

{¶ 2} RTA provides public transportation through the operation of fixed route large buses and smaller paratransit buses. RTA is a political subdivision, created under R.C. 306.31. Donaghy is RTA's Executive Director, and Ledford is RTA's Director of Operations.

{¶ 3} Rodriguez was initially hired by RTA as a Transportation Supervisor in July 1990, and she received several promotions. Ledford became Rodriguez's direct supervisor in October 2008, when Ledford was selected as Director of Operations. At that time, Rodriguez was Manager of the Command Center. In 2009, Rodriguez was promoted to Deputy Director of Operations, where she was responsible for overseeing RTA's daily transportation operations. These responsibilities included administrative functions, such as attendance, scheduling, overtime, vacation, payroll, drug and alcohol testing, performance evaluations, accident reporting, and customer service. Rodriguez received positive evaluations throughout her tenure at RTA.

{¶ 4} RTA has a set of policies for bus operators, the violation of which may result in disciplinary action. The disciplinary system places offenses into two categories. Group One offenses are generally less severe and result in written reprimands. Group Two offenses are more severe and may result in a bus operator's suspension or termination.

Group Two offenses include texting and the use of an electronic device while operating a bus. RTA's cell phone policy explains that a first offense will result in a three-day suspension, a second offense will result in a five-day suspension, and a third offense in an 18-month period will result in the termination of the employee.

{¶ 5} As Deputy Director of Operations, Rodriguez was the final arbiter of Group One offenses. With respect to Group Two offenses, bus operators could request a hearing on their Group Two charges before an operations supervisor, who reported to Rodriguez. The result of that hearing could be appealed to Rodriguez, who would issue her decision and advise Ledford of the decision. The operator could also appeal that decision to the labor relations manager. After the third step hearing, the union could vote to take the matter to arbitration. The operator could also pursue a formal grievance under the collective bargaining agreement between RTA and Amalgamated Transit Union ("ATU").

{¶ 6} In June 2011, bus operator Bridget Nabors was terminated for her third violation of RTA's cell phone policy.[1] Nabors filed a grievance, which was denied by her lead supervisor. The denial was appealed to Rodriguez, who upheld the termination at the second step grievance hearing. Nabors appealed again; the labor relations manager upheld the termination at this third step. Nabors then pursued a grievance with the union. RTA and the union reached an agreement that allowed Nabors to return to work under a "last chance agreement."

{¶ 7} On August 24, 2011, while Rodriguez was on vacation, Ledford notified

---

[1] According to Eugene Rhodes, Director of Human Resources for RTA, the video from the bus showed that Nabors retrieved her cell phone, hit a button, and handed the cell phone to a customer.

Rodriguez, by telephone and by email, of the decision to reinstate Nabors as a fixed route operator. The same day, Rodriguez responded to Ledford's email, stating:

> Hi! So what did WE get out of this? I've thought about this since you called me, and this just doesn't settle right with me, Allison. Once again, we have back-tracked. It's a safety issue with me and should be with everyone else... I guess I'll be pulling video many times a week! :) Hope we got something really worthwhile for going back on our own policy...sort of makes us look like chumps. Let me know, please. E

About ten minutes later, Ledford replied to Rodriguez by email, stating, "We're working on a couple things - Mark is talking with Rodney today so I'll know more later. It's a done deal though." Within a few minutes, Rodriguez replied back, "Thanks, Allison. I guess you know how I feel about cell phones while driving...at least I'm consistent. :) E."

{¶ 8} Later that same afternoon, Rodriguez received an email from Dale Crutcher, Labor Relations Manager, informing her that Nabors would be reporting to human resources the following day, would be reporting to training on August 29 and 30, and would be reporting to dispatch on August 31. Rodriguez replied by email, "What did we get out of the deal? Hope it's REALLY good to can our own policy."

{¶ 9} The following day (August 25), Rodriguez exchanged emails with Terry Cammack, Lead Supervisor, about Nabors's returning to work. Both Rodriguez and Cammack expressed frustration that the cell phone policy was not being enforced strictly. Cammack sent Rodriguez videos of accidents involving cell phone use.

{¶ 10} During the evening of August 25, Ledford sent a lengthy email to Rodriguez,

Cammack and another lead supervisor regarding Nabors's reinstatement. After addressing the reasons for the decision to reinstate Nabors, Ledford told them:

> * * * These are simply business decisions that I know you guys don't agree with, but that's part of what I have to do. * * * I don't always agree with the outcomes of what we do either, but I have to take each thing as it comes and when decisions are made with or without me, I have to accept it and move on. * * * In a nutshell, what I am asking is that you guys support me in accepting that this is a decision I made with Bridget Nabors, although not a popular one, and we move forward. We have lots of good days ahead – let's focus on those! Thanks everyone!

Rodriguez sent a reply email to Ledford, stating, "So we got nothing tangible?"

{¶ 11} Rodriguez returned to work on August 29, 2011. That morning, Rodriguez sent an email to Ledford asking her to confirm if any other operators had been terminated for cell phone violations. Ledford responded that she had other issues that she had to deal with, "so I need to move on from this issue."

{¶ 12} Also that morning (August 29), Rodriguez called Nabors into her office to meet with her; Rodriguez asked Supervisor Ken McDaniel and Trainer Deborah Whitaker to witness the "counseling session." (It was Rodriguez's regular practice to bring employees who had committed safety violations to her office for counseling.) During the meeting, Rodriguez showed Nabors a video of a bus accident involving a cell phone and told Nabors that if it had been her (Rodriguez's) decision, she would not have allowed Nabors to return to work. Rodriguez also told Nabors that she would be "pulling her tapes" and that Nabors

was going to hurt someone if she continued to use her cell phone in violation of the policy.

{¶ 13} After the meeting, Nabors submitted a letter to the human resources department complaining that Rodriguez "badgered" and "threatened" her and that it was creating "a hostile work environment." RTA began an investigation of Nabors's allegations against Rodriguez.

{¶ 14} On September 1, 2011, Rodriguez asked Ledford and Gene Rhodes, Human Resources Director, for a meeting to help Rodriguez understand what RTA had received from the union in exchange for allowing Nabors to return to work and why RTA "would do something like that with the safety issues." (Rodriguez Aff. ¶ 7.) Ledford discouraged the meeting and asked Rodriguez to drop the matter. Rodriguez agreed.

{¶ 15} On September 2, Ledford emailed Rodriguez, "I've been thinking about our conversation and I want to set up a meeting with you, me, and Gene today to discuss Bridget Nabors and get that done once and for all." Rodriguez responded that she had agreed not to pursue the matter further. Ledford replied, "I think we should have a meeting."

{¶ 16} During the meeting, Ledford and Rhodes showed Rodriguez the complaint that Nabors had submitted. Rodriguez denied badgering Nabors, but acknowledged that she told Nabors that she would not have reinstated Nabors and that she told Nabors that she would be "pulling her tapes." Rodriguez expressed to Ledford and Rhodes her disagreement with Nabors's reinstatement and said that she believed it was a safety issue. Rodriguez also told Ledford and Rhodes that operators and supervisors had told her that Kevin Frazier, a union representative, was saying that no one could be terminated under the cell phone policy as a result of Nabors's reinstatement. Ledford and Rhodes asked

Rodriguez for the names of the people who were saying that. Rodriguez refused to reveal her sources. At least two other times, Ledford and Rhodes asked Rodriguez to provide the names; Rodriguez again refused. Rodriguez testified at her deposition that she should have complied, and that she "overstepped [her] bounds."

{¶ 17} On September 5, 2011, Rhodes emailed Donaghy and provided him a summary of the September 2 meeting and a proposed letter of reprimand for Rodriguez. Rhodes also informed Donaghy about Rodriguez's accusations regarding Frazier and her refusal to provide the names of the people with whom she had spoken. Rhodes wrote: "I consider this a serious complaint against Kevin Frazier, and an even more serious issue with Ellen's refusal to provide the names of staff that were told this by Kevin. * * * I just can't imagine we would allow a key member of management to withhold information that could have serious consequences for the Authority." Donaghy responded to Rhodes (with a copy to Ledford), questioning whether Rodriguez's conduct constituted insubordination and dereliction of duty and expressing that he had "serious concerns" about Rodriguez's ability to lead. In his reply to Donaghy, Rhodes suggested that RTA "consider taking [Rodriguez] out of service until she provides the names."

{¶ 18} On September 7, 2011, Ledford issued a letter of reprimand to Rodriguez based on Rodriguez's August 29 meeting with Nabors and Rodriguez's refusal to identify the people who reported that Frazier had been saying that RTA could no longer defend sanctions for future cell phone infractions. Rodriguez received the letter of reprimand during a meeting with Ledford and Rhodes, during which Rodriguez was again asked to provide the names of operators and supervisors who told her that Frazier was telling drivers

that RTA could no longer defend the cell phone policy. Rodriguez continued to refuse to disclose the names. Rodriguez was instructed to leave the building within 30 minutes.

{¶ 19} Rodriguez returned to her office and requested a meeting with Donaghy. Donaghy agreed to meet with her, along with Rhodes and Ledford, in Ledford's office. During the meeting, Donaghy asked Rodriguez to provide the names of her sources. Rodriguez again refused. Donaghy also expressed concern about Rodriguez's treatment of Nabors. At the end of the meeting, Rodriguez asked to return to her office to consider signing the letter of reprimand and providing the requested names. Rodriguez returned to Ledford's office with an unsigned letter of reprimand, but she provided the names of two supervisors in the operations department. Rodriguez was placed on administrative leave and was again instructed to leave the premises. Rodriguez was told that Frazier's alleged statements would be investigated and that Rodriguez should not be there during that investigation.

{¶ 20} Rhodes and Ledford began an investigation of Rodriguez's statement that Frazier was saying that RTA would no longer be able to enforce the cell phone policy. During that investigation, Rhodes and Ledford spoke with Frazier, the two individuals that Rodriguez had identified, and most of the supervisors. Rhodes and Ledford concluded that the statements about Frazier were false.

{¶ 21} On September 19, 2011, after the investigation was completed, Ledford terminated Rodriguez's employment. The written notification cited several reasons for the termination, including:

> After interviewing all Supervisors in the Operations Department, it is

our conclusion that no one is aware of any change to the Cell Phone Policy or discussion by Kevin Frazier or any other person(s) that the decision to return Bridget Nabors to the job, impacts RTA's ability to enforce the policy as written and administered in the past.

It has also been determined that you have on numerous occasions expressed openly your disagreement with management's decision, and made it known throughout the [A]uthority of your objection to Bridget's return. * * * It has also been confirmed that Bridget was threatened with pulling her videos and being placed under surveillance as described in her complaint. Your conduct in this meeting was not in the best interest of the Authority and could have serious consequences in the future.

Nearly all Supervisors reported that you had them view the video of Bridget's third violation after the decision was made * * *.

The expectation of every member of management is to support Authority decisions, regardless of their personal feelings. It is unacceptable to express your disagreement in the manner in which you have done over the past several weeks. Your conduct has not been in the best interest of the Authority.

In addition to your unacceptable handling of this issue, you further compromised yourself by expressing to others that you were being fired for defending the Cell Phone Policy. * * * The very reason you were placed on Administrative Leave was to protect the integrity of the investigation.

{¶ 22} Rodriguez appealed her termination pursuant to RTA's procedures for salaried employees. Donaghy conducted a hearing on October 24, 2011. Following the hearing, Donaghy issued a memorandum upholding the termination.

{¶ 23} On December 31, 2011, Rodriguez brought suit against RTA, Donaghy, and Ledford (collectively, "Defendants"), claiming that her termination violated her free speech rights under the First Amendment to the United States Constitution and Section 2, Article I of the Ohio Constitution. In November 2012, Defendants filed a motion for summary judgment, claiming that Rodriguez did not engage in protected activity or speak as a citizen on a matter of public concern. They claimed that "every statement Plaintiff made regarding the cell phone policy was uttered internally at RTA and as a result of her employment. Further, Plaintiff's termination was the result of her mistreatment of employees she supervises, her insubordination, and the lies she told during an internal investigation." Donoghy and Ledford further claimed that they were entitled to qualified immunity.

{¶ 24} The trial court granted Defendants' motion, holding that Rodriguez's speech was made pursuant to her official duties and, as a result, was not entitled to First Amendment protection. In light of this conclusion, the court stated that it did not need to address whether Rodriguez spoke on a matter of public concern, nor did it apply a balancing test to determine whether RTA's actions were appropriate. The court further concluded that Donoghy's and Ledford's qualified immunity argument was moot.

{¶ 25} Rodriguez appeals from the trial court's judgment, raising two assignments of error.

*II. Public Employee's First Amendment Claims*

**{¶ 26}** Rodriguez's assignments of error state:

    I.   THE TRIAL COURT ERRED BY APPLYING ITS FIRST AMENDMENT ANALYSIS TO SPEECH NOT SUBJECT OF MS. RODRIGUEZ'S FIRST AMENDMENT CLAIM.

    II.   THE TRIAL COURT ERRED IN FINDING MS. RODRIGUEZ DID NOT SPEAK AS A CITIZEN WHEN SHE SPOKE OUT ON A MATTER OF PUBLIC SAFETY UNRELATED TO HER JOB RESPONSIBILITIES.

**{¶ 27}** In her assignments of error, Rodriguez claims that the trial court incorrectly focused on her statements during and subsequent to the counseling session with Nabors, rather than her statements prior to the counseling session regarding Nabors's reinstatement . Rodriguez further claims that the trial court erred in concluding that she was not speaking as a citizen when she spoke out regarding Nabors's reinstatement and her belief that RTA's actions posed a safety issue.

**{¶ 28}** Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). To

this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). Those materials include "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, filed in the action." *Id.* at 293; Civ.R. 56(C).

{¶ 29} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Id.* Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 30} "A government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." *San Diego v. Roe*, 543 U.S. 77, 80, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004). However, the government, as an employer, may impose certain restraints on the speech of its employees, even though those restraints would be unconstitutional if applied to the general public. *Id.* Public employees have a First Amendment right to speak on matters of public concern, "typically matters concerning government policies that are of interest to the public at large, a subject on which public employees are uniquely qualified to comment." *Id.*

{¶ 31} The United States Supreme Court has articulated a two-step analysis for First Amendment claims. First, the employee must show that he or she spoke as a citizen

on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). On the other hand, "[i]f the answer is yes, * * * [t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* "Even if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged. Courts balance the First Amendment interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Borough of Duryea, Pa. v. Guarnieri*, – U.S. –, 131 S.Ct. 2488, 2493, 180 L.Ed.2d 408 (2011), quoting *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

**{¶ 32}** The Sixth Circuit has applied this standard by employing a burden-shifting framework. *Dye v. Office of the Racing Comm.*, 702 F.3d 286, 294 (6th Cir.2012). The employee must first make a prima facie case of retaliation by showing (1) he or she "engaged in constitutionally protected speech or conduct;" (2) the employee was subject to an adverse action "that would deter a person of ordinary firmness from continuing to engage in that conduct;" and (3) a causal connection exists between elements one and two, i.e., "the adverse action was motivated at least in part by [the] protected conduct." *Id.*, quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir.2006).

**{¶ 33}** "If the employee establishes a prima facie case, the burden then shifts to

the employer to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Id.*, quoting *Eckerman v. Tenn. Dept. of Safety*, 636 F.3d 202, 208 (6th Cir.2010). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman* at 208. In First Amendment retaliation claims, the burden does not shift back to the employee to show pretext, unlike in the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Dye* at 295.

{¶ 34} The trial court's ruling concerned the first aspect of a free speech claim, namely whether Rodriguez engaged in constitutionally protected speech. Whether a public employee's speech is protected under the First Amendment is a question of law, not of fact. *Dixon v. University of Toledo*, 702 F.3d 269, 274 (6th Cir.2012); *Fox v. Traverse City Area Public Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir.2010).

{¶ 35} Speech is of "public concern" when it relates to "any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684, 75 L.Ed.2d 708. A matter is of public concern when it is "something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *Roe* at 83-84. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick* at 148.

{¶ 36} There is also no bright line test for determining whether an employee is speaking as a private citizen. That fact that an employee has expressed his or her views at

his place of employment, rather than publicly, is not dispositive as to whether the employee spoke as a citizen. *Garcetti*, 547 U.S. at 420, 126 S.Ct. 1951, 164 L.Ed.2d 689. "Employees in some cases may receive First Amendment protection for expressions made at work. Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like 'any member of the general public' to hold that all speech within the office is automatically exposed to restriction." *Id.*, quoting *Pickering*, 391 U.S. at 573, 88 S.Ct. 1731, 20 L.Ed.2d 811. Moreover, the fact that the subject matter of an employee's speech concerned his or her employment is not dispositive. *Id.* at 421. "The First Amendment protects some expressions related to the speaker's job." *Id.*

{¶ 37} However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti* at 421. In determining whether an employee's statements were made pursuant to his or her duties, the Sixth Circuit has considered several factors, including the impetus for the employee's speech, the setting of the speech, the speech's audience, the general subject matter of the speech, whether the statements were made to individuals "up the chain of command," and whether the content of the speech is "nothing more than 'the quintessential employee beef: management has acted incompetently.'" (Citation omitted.) *Handy-Clay v. Memphis*, 695 F.3d 531, 540 (6th Cir.2012). Although not dispositive, other relevant considerations include whether the speech was made inside or outside of the workplace and whether it concerned the subject-matter of the speaker's employment. *Id*. at 540-41.

**{¶ 38}** We further note that an employee who makes an unprotected statement is not immunized from discipline by the fact that he or she has also made protected statements. *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). So long as the employee is terminated only for the part of the speech that was either not on a matter of public concern, or on a matter of public concern but disruptive, "it is irrelevant whether the rest of the speech was * * * both on a matter of public concern and nondisruptive." *Id.*

**{¶ 39}** In granting summary judgment to Defendants, the trial court concluded that Rodriguez spoke as a public employee pursuant to her official duties, not as a private citizen. The court stated that "[t]he critical issue is not whether Ms. Rodriguez spoke beyond the bounds of the counseling with Ms. Nabors but whether the statements were made pursuant to the counseling. Ms. Rodriguez's statements and concerns regarding RTA's cell phone policy all stemmed from her counseling session with Ms. Nabors as a result of Ms. Nabors being permitted to return to work after her third violation of RTA's cell phone policy." After reviewing several Sixth Circuit opinions regarding addressing similar issues, the court concluded that Rodriguez's speech during the counseling session was made pursuant to her official duties. It further concluded that "Ms. Rodriguez expressed her concerns to Ms. Ledford and other superiors within the chain of command at RTA, indicating that her speech was undertaken in the course of performing her job." The trial court thus held that Rodriguez's speech was not entitled to First Amendment protection.

**{¶ 40}** On appeal, Rodriguez asserts that her protected speech included several statements made on four separate dates between August 24, 2011 and September 2, 2011. She cites to her emails to Ledford, Cammack, and Crutcher on August 24 and 25, her email

to Ledford on September 1, and her statements regarding the cell phone policy at the September 2 meeting. Rodriguez agrees that the statements she made during the August 29 counseling session with Nabors were not protected speech.

{¶ 41} As an initial matter, we agree with the trial court that all of the statements Rodriguez made during the counseling session with Nabors and subsequent to that counseling session were made in her capacity as Deputy Director of Operations of RTA and not as a private citizen. Although Rodriguez states that she "stepped outside of [her] bounds" when she "counseled" Nabors, Rodriguez nevertheless spoke with Nabors as Nabors's superior at RTA, not as a fellow citizen. Rodriguez's subsequent communications with Ledford, Rhodes, and Donaghy regarding Nabors's reinstatement and its effect on the cell phone policy (including the statements made at the September 2 meeting) were made in the course of RTA's investigation of Nabors's complaint against Rodriguez. Accordingly, the trial court properly concluded, as a matter of law, that Rodriguez's statements to Nabors at the August 29 "counseling session" and her statements to Ledford, Rhodes, and Donaghy subsequent to her meeting with Nabors were not protected by the First Amendment.

{¶ 42} As Rodriguez emphasizes in her first assignment of error, the trial court did not expressly address the emails that Rodriguez sent while she was on vacation and the emails she sent to Ledford on August 29 and September 1. Each of the emails expressed Rodriguez's disagreement with RTA's decision to reinstate Nabors, and several statements indicated her belief that the reinstatement created safety issues. The trial court implicitly addressed these statements when it held that "Ms. Rodriguez expressed her concerns to Ms. Ledford and other superiors within the chain of command at RTA, indicating that her speech

was undertaken in the course of performing her job."

{¶ 43} Upon review of the record, we conclude that the statements that Rodriguez made while on vacation and upon her return to work on August 29 were also made in her capacity as deputy director of operations, not as a private citizen. Rodriguez's emails while on vacation and upon her return were to individuals within her chain of command and other management involved in Nabors's return to work. All were made in response to Ledford's messages notifying relevant management of Nabors's reinstatement. Rodriguez had been involved with Nabors's appeal from her termination for violating the cell phone policy, and Rodriguez's position as deputy director of operations placed Rodriguez in a supervisory position relative to Nabors upon Nabors's return to work. The content of Rodriguez's speech was "nothing more than 'the quintessential employee beef: management has acted incompetently.'" *Handy-Clay*, 695 F.3d at 540.

{¶ 44} Rodriguez attempts to distance her speech from her position as deputy director of operations by stating that she went "outside the bounds" of her authority. She emphasizes that she had no official responsibilities involving Nabors's reinstatement, nor was it her (Rodriguez's) job to question Ledford's decision to return Nabors to work. *Garcetti*, which addressed speech pursuant to "official duties," concerned statements by an assistant prosecutor in a disposition memo that were written "because that is part of what he, as a calendar deputy, was employed to do." *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951, 164 L.Ed.2d 689. However, nothing in *Garcetti* suggests that an employee speaks in his official capacity (rather than as a private citizen) only when the statements are mandated by the employee's job description. In Rodriguez's case, the circumstances surrounding

Rodriguez's speech reflect that all of her statements were made as deputy director of operations, not as a private citizen.

**{¶ 45}** Even if we were to consider, for sake of argument, that the statements cited by Rodriguez were protected speech, there is no indication in the record that Rodriguez was terminated due to these statements. As stated above, Ledford notified Rodriguez of the results of RTA's investigation of Rodriguez in a written notification dated September 19, 2011. That notice cited several reasons for Rodriguez's termination, including (1) RTA's conclusion that no one was aware of any change to the cell phone policy or discussion by Frazier that the decision to reinstate Nabors impacts RTA's ability to enforce the cell phone policy, (2) that Rodriguez had expressed her disagreement with the Nabors decision in an unacceptable manner by orally expressing her disagreement throughout RTA, the meeting with Nabors, and having nearly all supervisors view the video of Nabors's third cell phone policy violation, and (3) that Rodriguez handled the investigation of her own conduct unacceptably by expressing to others that she was expecting to be fired for defending the cell phone policy.

**{¶ 46}** Ledford did not cite Rodriguez's emails to her (Ledford) on August 24 and 25, nor the August 29 and September 1 emails (which were sent after Rodriguez returned to work) as a basis for Rodriguez's termination. Ledford told Rodriguez to "drop" the matter on September 1, and the record demonstrates that Rodriguez agreed not to pursue the issue further. There is no indication that Rodriguez's termination was precipitated by Rodriguez's prior communications to Ledford about Nabors's reinstatement and Rodriguez's beliefs about the effect of the reinstatement on enforcement of the cell phone policy.

Rodriguez also points to her email exchange with Cammack on August 25, 2011. Here also, there is no indication in the record that this exchange was a basis for Rodriguez's termination.

{¶ 47} In short, Rodriguez has not created a genuine issue of material fact that a causal connection exists between her termination and the statements that she claims she made outside of her job duties. Accordingly, even if we were to assume, for sake of argument, that those statements were made by her as a citizen regarding a matter of public concern, Rodriguez has not demonstrated a First Amendment retaliation claim based on that speech.

{¶ 48} Moreover, we emphasize that, even if Rodriguez's communications with Ledford regarding Nabors's termination were protected, nothing prevented RTA from terminating Rodriguez's employment due to Rodriguez's inappropriate conduct and any unprotected speech. Defendants had no duty to accept actions by Rodriguez which they believed would disrupt the office, undermine their authority, and destroy close working relationships. *See Connick* at 158.

{¶ 49} Rodriguez, a high-level supervisor at RTA, complained about Nabors's reinstatement and her (Rodriguez's) own anticipated termination from RTA to numerous people throughout RTA. In their motion for summary judgment, Defendants presented evidentiary material that they reasonably believed these statements undermined the authority of Rodriguez's superiors. It is undisputed that during Rodriguez's counseling session with Nabors, Rodriguez told Nabors that she would not have reinstated Nabors and that she would be "pulling [Nabors's] tapes." Nabors considered Rodriguez's statements to be

intimidating and threatening, leading Nabors to file a complaint against Rodriguez. Ledford stated that Rodriguez's conduct at the meeting was not in RTA's best interest, and Rodriguez concedes that her statements to Nabors during the counseling session were not protected. In addition, as part of the investigation into Nabors's complaint, Rodriguez repeatedly refused to identify the individuals who attributed statements to Kevin Frazier regarding future enforcement of the cell phone policy. Rodriguez admitted in her deposition that she should have complied with her supervisors' requests for that information. Thus, even assuming that Rodriguez initially engaged in protected speech when she expressed that Nabors should not have been reinstated, Rodriguez did not establish a genuine issue of material fact that her termination was based on any protected speech.

{¶ 50} The trial court, and this court, do not decide whether the decision to terminate Rodriguez was the correct decision, only that Rodriguez has not shown that there is genuine issue of material fact warranting a claim of retaliation to proceed to a jury trial. Here, the trial court did not err in granting Defendants' motion for summary judgment. Accordingly, the assignments of error are overruled.

### III. Conclusion

{¶ 51} The trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, P.J. and WELBAUM, J., concur.

Copies mailed to:

John R. Folkerth, Jr.
Kenneth J. Heisele
Dwight A. Washington
Beverly A. Meyer

Hon. Michael W. Krumholtz